McLAUGHLIN et al. v. NATIONAL MUTUAL BOND & INVESTMENT CO.

(Circuit Court, E. D. Pennsylvania. December 13, 1894.)

No. 16.

FRAUD—"INSTALLMENT BONDS."

The N. Co. was organized for the purpose of "issuing and selling bonds upon monthly installments, and payable from the redemption and reserve fund," ostensibly intended to assist persons of moderate means to invest their savings to advantage. The system of investments which it devised and put in practice was such that an investor, receiving no special advantage, could never get back even all he had put in; but a chance was offered, by anticipated redemption of some of the bonds, to obtain an exorbitant premium at the expense of other investors. *Held*, that such a scheme was deceptive and fraudulent, and, in its nature, simply gambling; that a bondholder who had paid money into the treasury of the corporation was entitled to have a receiver of the assets of such corporation appointed, to prevent fraud, and preserve the subject of litigation, pending the determination of the rights of all bondholders.

This was a suit by George W. McLaughlin and others against the National Mutual Bond & Investment Company for an injunction and receiver. Hearing upon bill and answer.

Ernest L. Tustin, for complainants.
John J. Ridgway, for defendant.

DALLAS, Circuit Judge. Upon the filing of this bill, and before answer, a motion for injunction and for the appointment of a receiver was made, which was refused, because no necessity for making an order involving such serious consequences, in advance of the formal presentation of the defense, was perceived. The cause has, however, been since fully heard on bill and answer, and is now for decision; but two incidental matters will be first disposed of. Charles A. Chase has applied for leave to intervene as a party plaintiff. This application is supported by affidavit that he is one of the class on whose behalf the bill was filed. I do not recall that his right to intervene was disputed. At all events, it appears to be unquestionable, and he will be allowed to exercise it. The defendant has moved that certain affidavits which were filed on behalf of the plaintiff on November 8, 1894, be stricken from the record. These affidavits were filed without leave of court, and under the impression that they would be for consideration on final hearing. This was a mistake. I have not considered them, and the defendant's motion will be granted.

The defendant is a corporation created under the law of the state of West Virginia "for the purpose [as stated in its certificate of incorporation] of issuing and selling bonds upon monthly installments, and payable from the redemption and reserve fund, made up of the appropriation of a certain part of the installments paid in, according to tables which insure perfect equity to both large and small investors; the advantage of the association being to encourage and assist persons of moderate means to systematic saving, and by advantageous co-operation to realize larger profits than they could by investing in savings banks or building associations." In pursuance of this de-

clared purpose of its creation, the defendant issues what are designated as "Installment Bonds," and which are in form certificates of its agreement to pay $1,000 to the person named in each of such bonds respectively. No definite time is specified for making this payment, but it is therein provided that the "bond shall become due and payable at the office of the said company on its surrender, when the monthly installments thereon, together with its proportionate share of the reserve fund, shall equal its face value." This undertaking to pay at a time not fixed, but made contingent upon the operations of the company, is subject to "the following express terms and conditions": There shall be paid to the company "monthly installments" of four dollars each, and "quarterly dues" of one dollar each; and any default in either of these shall wholly release the company from obligation to pay at any time,—"shall work a forfeiture of the bond." The instrument further provides that upon forfeiture of the bond "all previous payments" made by its owner shall likewise be forfeited; that when forfeiture occurs "a new bond in the regular order of issue at the date of surrender" of the forfeited bond can be obtained; and that if the bond shall have been "kept in force by its terms and conditions for three years," "the monthly installments made thereon, together with interest at the rate of two per centum per annum," will be refunded upon its surrender. To this point the meaning of the agreement plainly is that the company, in consideration of the payment to it of four dollars per month and one dollar quarterly, will (subject to the terms and conditions which have been mentioned) pay $1,000 to the owner of the bond when the monthly installments paid by him, together with his "proportionate share of the reserve fund," shall amount to $1,000; or, in the alternative, will refund him the amount of his monthly installments, with interest at the rate of 2 per cent., at or after the expiration of three years, if all the prescribed monthly and quarterly payments shall have been duly made. If it had been proposed merely to return to the holders of these bonds the sum of their monthly installments when they should respectively amount to $1,000, it is scarcely conceivable that any sane man could have been induced to part with his money. He would have no security for it; it would bear no interest; it would be withheld from him for 250 months, or about 20 years; and, to accomplish this, he would pay an additional sum of $80. Of course, any misguided person who might be led into such a transaction would, on perceiving its character, hasten to withdraw from it, even at the sacrifice of payments already made, or would await only the expiration of the period of three years to claim the refund provided for. But nothing he could do would profit him. Even if the company should be able to, and should in fact, refund him his monthly installments with the interest stipulated, he would not be repaid in full. At the end of three years he would have paid as monthly installments $144, and this, with 2 per cent. interest added, would make $146.88, the amount to be refunded; but his "quarterly dues" for the same period would be $12, which, being added to his monthly installments, $144, would make a total of $156; and hence the so-called "refunding" would consist in returning to him, after three years of waiting, $10.88

less than he had actually paid in. Manifestly, there would be nothing in this "to encourage and assist persons of moderate means to systematic saving, and by advantageous co-operation to realize larger profits than they could by investing in savings banks or building associations." The enticing feature of the system—the real and only allurement it presents to induce contribution to it—is to be found in that provision of the fourth clause of the bond which appropriates to its possessor "its proportionate share of the reserve fund," and declares that "it is subject, however, to redemption by the company at any time before its maturity, after all bonds of a lower number of this series have been redeemed, canceled, or terminated.

If so redeemed during the 1st year, the holder shall receive.......... $336 00
If so redeemed during the 2nd year, the holder shall receive.......... 440 00
If so redeemed during the 3rd year, the holder shall receive.......... 561 33
If so redeemed during the 4th year, the holder shall receive.......... 702 88
If so redeemed during the 5th year, the holder shall receive.......... 863 01
If so redeemed any time after the 5th year, the holder shall receive 1,000 00

What the reserve fund is, or how to be derived, the bond does not explain, but in the company's certificate of incorporation it is referred to as "the redemption and reserve fund made up of the appropriation of a certain part of the installments paid in." What part of the installments is to be so appropriated is nowhere stated, but that it must be a very large part is made apparent by the following statement:

To redeem a single bond during the first year, there would be required ................................................................. $336 00
At the end of that year its owner would have paid in monthly installments ................................................. $48 00
Let interest be added on each installment.................. 1 32
                                                                        ——— 49 32

Excess ....................................................... $286 68

According to the plan, this excess of $286.68 must be provided for from the forfeited or nonforfeited installments—either or both—paid in by others. If from forfeited installments, the one man wins what the others have, by misadventure, already lost, and if from nonforfeited installments, then the lucky individual gains extravagantly at the cost of later purchasers, for these must be additionally postponed in order that he may be immediately and excessively paid, and many of them must suffer a total loss through the ultimate exhaustion of the fund by the "redemption" of "bonds of a lower number" at an enormous and unconscionable premium. This might be deemed fair play by those who wittingly engage in games of chance, but as a method of "systematic saving" provided for unwary "persons of moderate means" it certainly does not "insure perfect equity" as equity is understood by courts of justice. It appeals to cupidity, not to thrift; and lures to hazard, not to providence. It is a contrivance for handing over to some of those who embark in the venture the money of the others who join in it; and "it is quite apparent that this can only continue so long as the treasury can be replenished by bringing in new members." Its inherent vice is substantially the same as was pointed out with respect to a similar concern in the Case

of the National Endowment Co., 142 Pa. St. 450, 21 Atl. 879, and of which the supreme court of Pennsylvania said:

"It manifestly belongs to that class of associations, by far too numerous, the practical effect of whose operations is to enrich a few at the expense of confiding and ignorant people. Such corporations are 'unlawful and injurious to the community.'"

It is evident that the attractiveness of the present project is due to the opportunity which it affords for acquiring money by chance, and not as the reward of industry, frugality, or sagacity. The interesting question to those who participate in it is one of fate, and nothing else. It is this: Which of them shall be forced to forfeit, and so "fall in fortune's strife"; and which of them, surviving that catastrophe, will have obtained redemption of their bonds before the final and inevitable collapse occurs? Upon these contingencies the monthly and quarterly payments are put in jeopardy, and according to the issue of the game, the company, the holder of these stakes, distributes them among the winners. All such schemes are inhibited. They are deceptive and fraudulent, and in their nature simply gambling. In re National Endowment Co., supra; Brua's Appeal, 55 Pa. St. 294; U. S. v. McDonald, 59 Fed. 563; Horner v. U. S., 147 U. S. 449, 13 Sup. Ct. 409.

These plaintiffs are owners of "bonds" of the defendant company, upon which they have paid the required installments and dues. The money in the treasury of the company, therefore, constitutes a fund to which they are entitled to resort for recovery of their contributions to it. The possession of that fund was, as has been shown, obtained through fraud, and is in danger of misapplication in pursuance of an unlawful purpose. I am therefore of opinion that, irrespective of any considerations of a general or public nature, the case made out is one which demands the appointment of a receiver, for the prevention of fraud and the preservation of the subject of litigation. Complainants' counsel has mentioned five cases in which, it is said, the Pennsylvania courts of common pleas for the county of Philadelphia have, through receivers, taken possession of the funds of associations like the one now before this court; but those cases have not been reported, or in any manner presented for my examination, and consequently I have not had the advantage of consulting them. If they have been rightly understood by counsel, they support the conclusion which I have reached in the present one.

It is objected that these complainants are not entitled to relief, because, under the terms of their bonds, they might surrender them, and receive a return of their monthly installments with interest; but I cannot assent to this. The reimbursement suggested—not tendered—would not be satisfaction. It would be less than the aggregate amount of all the payments (installments and dues) which the complainants have made; and the precise sum to which they may be actually entitled can be known only upon a full accounting, and an adjustment of the rights of all parties. There are other grounds upon which, perhaps, this objection should be overruled, but enough, I think, has been indicated to show that it is not well taken; and it would be unfortunate if this were otherwise, for the ends of justice

would not be subserved by maintaining any technical subtlety which would render this suit abortive.

The motion of Charles A. Chase for leave to intervene as party plaintiff is granted. The defendant's motion to strike off the affidavits filed on behalf of the complainants on November 8, 1894, is granted. Counsel for the plaintiffs may prepare a decree for a receiver and injunction, and submit the same for settlement upon 48 hours' notice (with copy of the decree proposed) to defendant's counsel.