In re E. J. ARNOLD & CO.

(District Court, E. D. Missouri, E. D.   April 15, 1904.)

1. GAMING—GAMING TRANSACTIONS—RECOVERY OF MONEY ADVANCED.

Money lost in betting on horse races, or advanced with the intention that it shall be used in a gaming venture, in the profits of which the person advancing it is to share, cannot, as a rule, be recovered back.

2. FRAUD—PROCUREMENT OF MONEY—TITLE OF PERPETRATOR.

Persons who secure money from depositors by false and fraudulent representations of material facts take no title to the money as against the depositors, who may, on discovery of the fraud, take legal steps to regain possession thereof.

3. BANKRUPTCY—PROCUREMENT OF MONEY BY FRAUD—REMEDY OF CREDITORS.

Creditors in bankruptcy proceedings may invoke the principle that money procured by fraud may be recovered back, by proving a demand for money had and received by the bankrupt to their use.

4. SAME—PROVABLE CLAIMS—GAMBLING TRANSACTIONS—MONEY OBTAINED BY FRAUD.

Creditors of bankrupts, who advanced money to them on the strength of their fraudulent representations that they were earning sufficient profits to pay a stipulated weekly interest; that they were solvent and responsible, and had on hand sufficient money to pay all their depositors the amount of their deposits; and that they did not pay dividends out of receipts—may prove up their claims in bankruptcy proceedings, although they knew and intended that the money which they advanced to the bankrupts would be used in gambling ventures.

5. SAME.

In so far as a purpose to engage in gambling, in pursuance of which one party has advanced money to the other, has not been executed, the one advancing the money may sue to recover the same, or establish a claim therefor in bankruptcy proceedings.

6. SAME—STATUS OF CREDITORS.

A creditor who moves to expunge an allowance in favor of another creditor stands in the shoes of the bankrupts, and has no higher rights than they.

In Bankruptcy.

Sale & Sale, for petitioner.

J. W. Noble and E. L. Gottschalk, for Gottschalk Printing Co.

ADAMS, District Judge.   On July 2, 1903, the petitioner, Williams, formally made proof of a claim against the estate of the bankrupts in the sum of $5,200.   Afterwards the Gottschalk Printing Company made proof of a claim against the estate, and, on the standing thus secured, moved to expunge the claim of Williams. The referee heard evidence on this motion, and on March 3, 1904, made an order sustaining the same, and further ordered that the claim of Williams be expunged and disallowed.   The question so decided is brought here for review.

The reasons assigned for expunging petitioner's claim are, in effect, that the money which had been deposited by the petitioner with the bankrupts, and which was the basis of the claim proved up by Williams, was intrusted to the bankrupts by Williams with the intent and purpose that the same should be used for the joint account of both in gambling ventures; that is, betting on horse

races. It is undoubtedly true that money lost in betting on horse races cannot be recovered, and it is also true that the law does not generally lend its aid to relieve any one of several parties who knowingly and intentionally embark in a gambling venture. These general principles are well understood; but this case, in my opinion, presents other facts which distinguish it from cases falling under the general doctrine just announced.

A brief résumé of the facts found by the referee will disclose the nature and the extent of the business of the bankrupts, their method of soliciting deposits, and their method of operation: It appears that the bankrupts embarked in their business with a capital of only $10,000; that they commenced business in St. Louis some time in the year 1900, and continued the same until February 10, 1903, the date of the commencement of these proceedings in bankruptcy. The general character of the business conducted by the bankrupts was the same from the beginning to the end. By means of circulars, pamphlets, and newspaper advertisements, which were widely distributed, they invited the public to send to or deposit with them money to be used by them in conducting a racing stable, in buying race horses, "making books" on horse races, and betting on such races. The depositor received what the bankrupts termed a "certificate of deposit," being a receipt and contract by the terms of which the bankrupts agreed to share their profits with the depositor, to the extent of a certain stipulated per centum each week. At the outset the so-called profits agreed to be shared with the depositor were fixed at 5 per cent. per week; later on they were reduced to 3 per cent; and in December, 1902, they were reduced to 2 per cent. All of the receipts or certificates issued contained a provision that the deposit might be withdrawn, in whole or in part, at any time, on demand and the surrender of the certificate. The circulars, pamphlets, and advertisements distributed over the country by the bankrupts were well devised to impose upon the credulous and secure their confidence. The public was assured that the bankrupts' firm was no "get rich quick," "pay dividends out of receipts," or "bust up" concern. By means of lavish expenditures for advertising, the business was developed to large proportions. The daily receipts of money were sometimes as large at $38,000. At the date of the institution of bankruptcy proceedings against the firm, its total liabilities on account of deposits of money made with it exceeded $3,000,000, and the number of depositors exceeded 13,000. The patrons were given to understand that the weekly interest of 5, 3, or 2 per cent., as the case might be, was all paid out of the profits of the business; that the capital was unimpaired; and that any creditor or patron might withdraw his money at any time, upon giving a certain specified notice. It appears from the evidence that the only business conducted by the bankrupts with a view of earning money was the racing of their horses upon race tracks, and betting upon the results of horse races. The evidence shows, as reported by the referee, that during the whole three years of the business of the bankrupts the result of their betting ventures was from $250,000 to $300,000. This amount, therefore, may fairly be

said to be all of the money that the bankrupts ever earned; and this was all they ever had, besides their capital of $10,000 and the amount of the deposits made with them by their patrons. I also gather from the report of the referee that this sum of $250,000 to $300,000 was the gross amount of receipts from betting on horse races. The referee finds, and the evidence supports him in that finding, that the bankrupts actually conducted a business of the general character represented by them in their circulars, and that the persons who deposited money with them did so with the purpose and expectation that such money would be used in the business of breeding and racing horses and betting on horse races. From this general finding the referee reaches the conclusion that the patrons and the bankrupts were engaged in an unlawful venture, and that the petitioner in this case, who was one of the patrons, has no legal right to share in the assets of the bankrupts. I may here remark that the total amount of all of the property which came into the hands of the trustee in bankruptcy, when reduced to cash, will not exceed $100,000. In addition to the foregoing, the referee makes a finding of facts substantially as follows: That many of the most material representations made by bankrupts to the public, and upon the faith of which deposits of money were made with them, were entirely untrue. Bankrupts represented in their advertising matter that they had from the commencement of their business earned, were then earning, and expected thereafter to earn, sufficient "profits" to pay to depositors the stipulated amounts weekly, and that they were solvent and responsible, and had on hand sufficient assets to pay to all depositors the amount of their deposits, and that they did not pay dividends out of receipts, and that they conducted a legitimate business, licensed by state and city. The referee further reports that it is entirely clear from the evidence that these last-mentioned representations were false. He says "that the bankrupts at all times paid the so-called weekly profits out of the money received from depositors, and that their ability to continue paying the so-called weekly profits, and to meet the demands of withdrawing depositors, depended upon their securing a constant increase in the amount received from depositors."

From the foregoing facts, I have reached the conclusion that to deal with this case on the theory that the depositors and the bankrupts were simply engaged in an unlawful or gambling business is altogether too superficial a view. From the facts found by the referee, it is undoubtedly true that the bankrupts secured money from their so-called depositors by false and fraudulent representations of material facts. On familiar principles of law, they thereby secured no title to the money as against a depositor, who might, on discovery of the fraud, take legal steps to regain possession of his money. The law is equal to this emergency. It treats the fraudulent actor as a trustee for his victim. A constructive trust is created by the fraud practiced in securing the money. And in bankruptcy proceedings, which are summary and equitable in their nature, the creditors may invoke this salutary principle of law by

proving up a demand for money had and received by the bankrupts to their use. The vice inherent in the ultimate use to which the money was to be put does not, in my opinion, present any obstacle to a recovery based upon the fraud and imposition practiced in securing the money, and the trust thereby created. The assurances held out by the bankrupts to the public that they had earned from the commencement of their business, and were then earning, sufficient profits to pay to the depositors the stipulated weekly interest; that they were solvent and responsible, and had on hand assets sufficient to pay all their depositors the amount of their deposits; and that they did not pay dividends out of receipts—were representations of material facts, and intended and adapted to accomplish the purpose of securing deposits. The public obviously acted on these attractive representations, and parted with their money in the belief that they were true, when in fact they, and each of them, were grossly false. Notwithstanding the fact that the depositors were informed that their money, when obtained, would be used in gambling ventures, I think the actuating cause of their parting with their money was the false representations which gave them assurance of success. In such circumstances, the parties cannot be said to be in pari delicto. The greater wrong rested in the fraud practiced upon the public in securing the money. The purpose and object of the contract involved in the payment of the money to the bankrupts by the depositors may have been in contravention of the law, and to this extent the parties may have been in equal fault. But as said by Chief Justice Poland in a similar case (Hinsdill v. White, 34 Vt. 558):

"The plaintiff was induced to enter into [the contract] and to pay the money by false and fraudulent representations of the defendant. In such cases, are the parties to be regarded as in pari delicto, so that the law will regard them as equally reprehensible, and refuse to interfere?"

The learned chief justice answered this question in the negative.

Without analyzing other authorities to which my attention was called in argument, I may safely state that the conclusion reached in this matter is supported by the principles announced in the following cases: Catts v. Phalen & Morris, 2 How. 376, 11 L. Ed. 306; McLaughlin v. National Mutual Bond & Investment Co. (C. C.) 64 Fed. 908; Timmerman v. Bidwell, 62 Mich. 205, 28 N. W. 866; Jones v. Inness, 32 Kan. 177, 4 Pac. 95; Webb v. Fulchire, 25 N. C. 485, 40 Am. Dec. 419; Preston v. Hutchinson, 29 Vt. 144; Hodge v. Sexton, 1 Hun, 576; Pomeroy's Equity Jurisprudence (2d Ed.) § 403.

The result reached might be justified in another way: The small amount of money now in the hands of the trustee is the remnant of the depositors' money, not actually expended in gambling. There is abundant authority for the proposition that even though the original purpose of the parties was to engage in an unlawful venture, like gambling, yet, in so far as that purpose has not been executed, a locus penitentiæ is open to the depositors, and the courts of the land are open to them to recover their money. But I prefer to put this decision on the broad ground that the bankrupts

in this case shall not be allowed to secure deposits of money to the amount disclosed by this record by false and fraudulent representations of material facts, and afterwards be heard to say that the depositors shall not recover it from them, on the ground, forsooth, that the ultimate use to be made of the money was to bet on horse races. The right of recovery in this case is based upon the false representations of material facts, and the fraudulent acquisition of money thereby. Any other conclusion than that now reached would permit the bankrupts, after successfully swindling the community out of millions of money, to bid defiance to their creditors and enjoy the fruits of their iniquity, unrestrained.

The Gottschalk Printing Company, the creditor who moved to expunge the allowance in favor of Williams, must stand in the shoes of the bankrupts. Its right can rise no higher.

It results that the action of the referee in expunging the claim of the petitioner, Williams, must be disapproved, and it is ordered that the order heretofore made expunging the same be set aside, and that in lieu thereof there be an order allowing the claim of the petitioner as made.