## In re NORRIS.

(District Court, D. Minnesota, Fourth Division. September 29, 1911.)

**1. Bankruptcy (§ 314*)—Claims—Release.**

Where claimants, after bankruptcy proceedings had been commenced, expressly released the bankrupt from all claims against him, in consideration of the capital stock of a corporation, the release was valid and a bar to the claims in the absence of any evidence other than the release itself as against an objection that it was without consideration.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

**2. Partnership (§ 20*)—Relation—Construction.**

A bankrupt operated a speculating pool and issued three sets of certificates, one certifying a receipt of money in payment for a number of shares in the pool of the company, by the terms of which the latter agreed to invest the money according to its judgment and to pay the certificate holder on the first of each month his pro rata share of the profits. It also authorized the holder to draw his money or any part of it at the beginning of each month by giving 10 days' notice, and authorized the company to cancel the certificate on January 1, 1910, or on the 1st day of January thereafter by giving 30 days' notice. The second form of contract provided that the company should pay a dividend of $2.50 a share on each hundred dollars of profit on the first day of each month, and also provided that the investment could be withdrawn on the first of each month by giving 10 days' notice, and contained no provision for repayment by the company. The third form of certificate was the same as the second, except that it did not contain the word "pool." Held, that such certificates did not create the relation of partners between the company and certificate holders, but the relation of borrower and lender.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 20.*]

**3. Bankruptcy (§ 314*)—Lenders of Money—Right to Recover.**

Where, at the time of bankruptcy, the bankrupt had in his hands all the money he had received from lenders with which to conduct gambling transactions, the result of his operations being profitable, the lenders were entitled to share in the proceeds to the extent of their original investments.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

**4. Bankruptcy (§ 314*)—Money Loaned for Gambling—Conversion.**

Where a bankrupt, three or four days before bankruptcy proceedings were commenced, had a considerable sum of money in his possession, which had been loaned to him to conduct gambling transactions, which money was not used by him in gambling, but converted to his own use, the lenders were entitled to prove their claims against him for the full amount of the money delivered to him; he having failed to establish the amount of the funds converted.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 314.*]

In the matter of bankruptcy proceedings of Sherman R. Norris, trading as the Minnesota Grain Indemnity Company. On petition of

Emma Gould and 34 others for review of an order disallowing their claims against the bankrupt. Affirmed in part and reversed in part.

WILLARD, District Judge. This case came on to be heard before the court on the 23d day of September, 1911, upon the petition of Emma Gould and 34 others for a review of an order made by the referee on August 29, 1911, disallowing their claims against the above-named bankrupt.

Mr. Breding and Mr. Hall appeared in opposition to the order of said referee; Mr. Thomas and Mr. Newton appeared for certain creditors in support thereof, and Mr. Odell appeared for the bankrupt in support thereof.

· ·The order, so far as it relates to Emma Gould, Anton Swardm, Mrs. W. K. Pennell, Charles Silberman, F. W. Hewett, Clyde L. Ivey, Ed. Guslander, and Mrs. A. H. Dafoe, is affirmed.

[1] Each one of these claimants, after the bankruptcy proceedings were commenced, expressly released the bankrupt from all claims that they had against him. These claimants suggest that there was no consideration for such release. There is clearly nothing in this suggestion. The consideration named in the written contract was the receipt of capital stock in a corporation; whether that stock was at the time the receipt was signed worth more or less than the claim against Norris was something then considered and decided by the claimants, and they must have determined that it was worth more. In the absence of any evidence other than the release itself, the latter cannot be set aside.

[2] To the other claimants mentioned in said order three kinds of certificates, and only three, were issued by Norris. In the great majority of cases the certificate stated that Norris had received a sum of money therein mentioned in full payment for the number of shares therein stated in the pool of the Minnesota Grain & Indemnity Company, under which name Norris was then doing business. By the terms of that certificate the company agreed to invest this money according to its judgment, and to pay the certificate holder on the first of each month his pro rata share of the profits on hand at that time. The holder could draw the whole or any part of his money on the first of any month, by giving 10 days' notice of his intention so to do, and the company could cancel the certificate on the 1st day of January, 1910, or on the first day of any January after, by giving 30 days' notice.

. . . By the second form of contract, the indemnity company—that is, Norris—agreed to pay a dividend of $2.50 a share on each and every hundred dollars of profit, payable on the first of each month. This also provided that the investment could be withdrawn on the first of any month by giving 10 days' notice. It made no provision for repayment by the company.

The third form of certificate was similar to the second, except that it did not contain the word "pool."

The relation created by each of these certificates between the parties was that of lender and borrower. There is nothing in them to support the contention that the relation was that of partners. The word "pool"

is entirely insufficient for that purpose. The person paying the money had the right to withdraw it at any time. Norris had the right to return it at stated intervals. The fact that dividends were paid from the profits indicated only that such was the method adopted for paying interest on the money loaned.

[3] It is contended by the bankrupt, and by the creditors who objected to these claims, that the transaction between Norris and the certificate holders was void, because it was a gambling transaction, and evidence was presented to show that Norris speculated in wheat and stocks by buying and selling puts and calls, and by buying wheat and stocks on margin, which transactions were closed out, as a general rule, on the same day. Evidence was also introduced tending to show that certain certificate holders knew that the money was to be used for speculations of this kind. The referee supported this contention and disallowed the claims, holding that Norris was simply a wheat gambler, and that the claimants intrusted their money to him for the purpose of such gambling.

These creditors do not claim to recover any profits that Norris may have made; they do not base their claims upon the contract, but upon money had and received. All that they ask is that Norris pay back the amounts which he actually received from them.

In view of their restricted claims, I do not find it necessary to decide whether or not the transaction was illegal because it was for the purpose of gambling.

If Norris, at the time the petition in bankruptcy was filed against him, had in his hands all the money which he had received from these claimants; if the result of his gambling was that he had lost none of it, but then had it and profits in addition thereto—then I hold that the claimants would have a right to share in that sum, so far as their original investments were concerned, whatever may be said of their rights to the profits, and whatever may be said of their rights against Norris if he had lost the amounts intrusted to him.

If Norris had not gone into bankruptcy, and had intact the money which had been paid to him by the investors, and one of them had sued him at law, not for profits, not under the contract, but for money had and received, he could, in my judgment, have recovered. If such a person had said, "I will have nothing more to do with this transaction, I will gamble no more, and I wish my money back," can it be said that Norris could have answered, "I have gambled with your money, and though I have not lost it, and though I have it still in my possession, and though you have decided not to gamble any more and ask nothing from me by way of profits which I have made, yet, as long as you gave the money to me for the purpose of gambling, I can keep it"? It cannot be that the law would hold that such an answer was a sufficient one.

A somewhat similar case is found in Re E. J. Arnold (C. C.) 133 Fed. 789, 792, decided by Judge Adams of this circuit. See, also, In re Dorr, 186 Fed. 276, 108 C. C. A. 322, 26 Am. Bankr. Rep. 408. Moreover, if Norris, having received this money for an unlawful pur-

pose, did not devote it to that purpose, but appropriated it to his own use, in violation of the terms of the agreement between the parties, the claimants would have a right to recover.

The case is therefore reduced to a question of fact.

[4] Had Norris lost in gambling the money intrusted to him for that purpose, or did he have it at the time of his bankruptcy? Or had he then converted it to his own use in ways other than those provided for in the agreement between the parties? That Norris speculated in wheat with the money is proven. The claimants testify that he told them that he had a system for operating in the wheat market under which it was impossible to lose. Norris denies this. He says that occasionally, in very rare instances, he might lose; but he testifies that each month of his operations showed a net profit. His bookkeeper says that she does not remember that she ever entered a loss. The improbability of this result would make this evidence insufficient of itself to sustain a finding that Norris had the original investment or any part of it intact.

There is, however, other evidence which shows that he had not lost in speculation all of the money delivered to him. He rented a box in a safety deposit vault. The company owning the vault kept a record of the day, hour, and minute of every visit to the vault by the owner of the box. That record shows that the last time Norris was at the vault was on July 3d, three days before he disappeared. Norris does not himself testify that he took any money from the vault after July 1st. The attendant at the vault testified that on this last visit on July 3d, Norris took out the box, which was 2 inches deep and about 20 inches long; that on lifting the lid several bills of large denominations blew onto the floor; that he (the attendant) picked them up and delivered them to Norris; and that the box was full of bills. Later, on a warrant issued to the marshal, the box was opened, and the marshal found in it over $300 in bills. The box was apparently empty at that time, and the money was discovered only by shaking the box. Norris makes no explanation with regard to the disappearance of these bills, except to say that he did not take them, and has not secreted any property.

It satisfactorily appears from the evidence that a considerable part of the money was in the possession of Norris three or four days before the bankruptcy proceedings were commenced. It also appears that this money was not used by him in gambling. It therefore follows that Norris converted it to his own use, and for money so converted the claimants are entitled to recover. It does not appear how much money was there at that time; it was in the power of Norris to establish that fact. He has failed to do so, and the claimants are therefore, in my judgment, entitled to prove against him for the full amount of the money originally delivered to him by them.

The order of the referee is reversed as to the claimants who did not release their claims, and as to them the matter is remanded to the referee to determine from the evidence taken, or from such other evidence as he may see fit to receive, the amount of cash paid by each of these claimants to Norris, and to allow the claims for such amounts.

Among the papers submitted to the court upon this hearing is found a release signed by George Zahner. It does not appear that this release was offered in evidence before the referee. Upon the further hearing which is hereby ordered the referee may receive evidence as to such release, if it is offered, and determine whether the claim of Zahner should be allowed or not.