METROPOLITAN LIFE INSURANCE COMPANY, Appellant, *v.* JAMES H. DURKIN, as President of United Office & Professional Workers of America, et al., Respondents, et al., Defendants.

Argued May 16, 1950; decided July 11, 1950.

*Joseph M. Proskauer, Phillip W. Haberman, Jr., Burton A. Zorn* and *Eugene Eisenmann* for appellant.  I. The Insurance Law (§ 213, subd. 7; § 213-a, subd. 5) was intended to and does in explicit terms forbid retroactive increases in this as in all other cases. (*Matter of Rathscheck,* 300 N. Y. 346; *Settle* v. *Van Evrea,* 49 N. Y. 280; *Matter of Western Union Tel. Co. [ACA],* 299 N. Y. 177; *Corona Coal Co.* v. *United States,* 263 U. S. 537.)  II. Administrative interpretation of a statute is of vital importance. (*People ex rel. Trustees M. H. & A. Fund* v. *Miller,* 279 N. Y. 137; *Matter of Smith,* 279 N. Y. 479; *Roland Elec. Co.* v. *Walling,* 326 U. S. 657; *Skidmore* v. *Swift & Co.,* 323 U. S. 134; *Firemen's Ins. Co.* v. *Beha,* 30 F. 2d 539.)  III. The statute contains no words that exempt collective bargaining situations from its unqualified prohibition. No such exception can be judicially supplied without disregarding, not only the words, but the legislative history of sections 213 and 213-a. IV. The statute requires the compensation of life insurance agents to be fixed in advance.  It cannot be evaded by the device of not making contracts at all or by disregarding existing con-

tracts whenever collective bargaining is demanded. (*People* v. *Formosa,* 131 N. Y. 478; *Case Co.* v. *National Labor Relations Bd.,* 321 U. S. 332.)

*Murray I. Gurfein, Sidney E. Cohn, Louis B. Boudin* and *Daniel W. Meyer* for respondents. I. Sections 213 (subd. 7) and 213-a (subd. 5) of the Insurance Law do not apply to the situation here involved. (*People ex rel. Jackson* v. *Potter,* 47 N. Y. 375; *Vail* v. *Broadway R. R. Co.,* 147 N. Y. 377; *Cole* v. *State of New York,* 102 N. Y. 48; *Matter of Meyer,* 209 N. Y. 386; *People* v. *Ryan,* 274 N. Y. 149.) II. The evils intended to be prevented by the Legislature in enacting sections 213 (subd. 7), and 213-a (subd. 5), were voluntary and gratuitous payments by insurance companies of extra compensation to agents on the basis of favoritism or as a reward for " special merit ". The Legislature never intended that, where there was a bona fide dispute on wages or where an official body was considering such a dispute, retroactive compensation could not be paid for the period when the matter was pending or *sub judice.* III. Under the circumstances the so-called " ruling " of the Superintendent of Insurance and his opinion regarding this case are entitled to no weight. (*Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144; *Walling* v. *Swift & Co.,* 131 F. 2d 249; *Commonwealth* v. *Giltinan,* 64 Pa. 100; *State* v. *Hunt,* 235 Wis. 358.) IV. Sections 213 (subd. 7) and 213-a (subd. 5) do not bar the payment of the retroactive compensation ordered by the War Labor Board, because such payment is not " greater than that which has been determined by agreement made in advance." (*Matter of Mahon* v. *Board of Educ.,* 171 N. Y. 263; *Cole* v. *State of New York,* 102 N. Y. 48; *Evadan Realty Corp.* v. *Patterson,* 192 Misc. 850; *Christie* v. *Port of Olympia,* 27 Wn. [2d] 534.) V. There was no pre-existing agreement in this case limiting the amount of compensation. Therefore, the employees are entitled to recover the reasonable value of their services. (*Starling Realty Corp.* v. *State of New York,* 286 N. Y. 272; *Dunkel* v. *Homindustries, Inc.,* 275 N. Y. 327.)

DESMOND, J. Subdivision 7 of section 213 of the Insurance Law prohibits the payment to life insurance agents of " any compensation greater than that which has been determined by agreement made in advance of the payment of the premium ".

Subdivision 5 of section 213-a of the same law prohibits the payment to agents selling industrial life insurance of "any compensation greater than that which has been determined by agreement made in advance of the rendering of such service." Plaintiff, a domestic mutual life insurance company, brought this action against two labor unions and certain individual defendants, praying for a judgment which would declare that those two statutes bar the payment, by plaintiff to about 8,000 of its insurance agents, of additional compensation at the rate of $2.85 per week, for a period during which proceedings for a wage increase were pending before the National War Labor Board. In other words, plaintiff employer asserts, and seeks an adjudication, that the statutes which forbid added remuneration for past services operate to make unlawful so much of a wage arbitration award as orders that a determined wage increase be paid as of the date of the submission to arbitration. Many other interesting questions have been briefed but plaintiff frankly tells us that, if it be wrong in its interpretation of those statutes, then the award was wholly valid and the judgment below, in favor of defendants, is correct.

We agree with the trial court and with the Appellate Division (and with the National War Labor Board, and with the United States District Judge who passed on the same question in *Paris* v. *Metropolitan Life Ins. Co.*, 68 F. Supp. 64, revd. without passing on this issue, 167 F. 2d 834) that the above-cited statutes have no bearing at all on, and were never intended to make unlawful, the ordinary and traditional consequence of collective bargaining, that is, the ordering of a wage increase dating back to the beginning of the proceedings.

The material facts are these:

April, 1938 — defendant, Industrial Life Insurance Company Agents Union, Local 30, was certified by the New York State Labor Relations Board as collective bargaining agent for plaintiff's employees in New York City and nearby communities.

June, 1942 — a dispute arose between plaintiff and its New York City employees involving, among other things, the compensation of sellers of industrial insurance; negotiations for settlement were fruitless.

October, 1942 — the United States Secretary of Labor, at the request of defendant Industrial Life Insurance Company Agents

Union, Local 30, certified the dispute to the National War Labor Board.

May, 1943 — after the board had decided, over plaintiff's objection, that the board had jurisdiction, and after hearings before the board, the parties made a voluntary agreement as to all disputed matters except compensation, which branch of the dispute, the voluntary agreement recited, was "being submitted to the War Labor Board". (Similar voluntary agreements each containing the same recital, were, later on, made by plaintiff with the other union here as a defendant [UOPWA] which latter union represented plaintiff's agents in six States other than New York; the wage question, as to the members of UOPWA, was, by stipulation, consolidated with the original proceeding before the board.)

September, 1943 — the Regional War Labor Board made its order that the agents involved in the original (New York City) dispute should have their compensation increased by $2.85 per week, retroactive to October 24, 1942, the date on which, as we have noted above, that dispute had been certified to the board.

July, 1944 — after plaintiff had appealed from the Regional Board's order to the National War Labor Board and hearings had been had there, plaintiff and the unions made a stipulation in which plaintiff agreed that it would "not question the power of the Board to make the order, nor that it is a final order of the Board, nor will it question the determination of the amount of the compensation involved, but it will question only its ability to make retroactive payment, in view of the provisions of Sections 213 and 213-a of the New York State Insurance Law." In other words, plaintiff abandoned all its previously stated objections, except that plaintiff continued to insist, as it had all along insisted, that the New York statutes forbade any retroactivity of award. This stipulation put completely out of the picture any question as to the jurisdiction of the board to fix a fair wage, and so nothing more will be said herein on that jurisdictional question.

September, 1944 — the National War Labor Board made its order affirming the Regional Board's determination including retroactivity, as to each group of employees, to the date of certification of the dispute to the board. Pursuant to an agree-

ment previously made between the company and the unions, the part of the award contested as unlawfully retroactive (about $800,000) was deposited in escrow to await court action as to the effect thereon of the New York statutes.

We find nothing in either the language or the history of the two Insurance Law sections, to support plaintiff's attempt to apply those laws here. Nothing could be plainer than the reasons for, and purposes of, those enactments, and those reasons and purposes have no relation whatever to the facts of this case. Section 213 (formerly § 97) was put on the books in 1909 (L. 1909, ch. 33; renum. in 1939) as one of the fruits of the Armstrong Committee's extensive inquiry into the evils and abuses of the insurance business. The necessity for a law against bonuses or gratuities for past service was explained by the committee itself (see Report of the Legislative Insurance Investigating Committee, 1905 [published by J. B. Lyon Co.], Vol. VII, pp. 305-306). Its plain purpose was to put an end to excessive and ex post facto rewards, and it had no objective in any way relevant to the situation here. Section 213-a was enacted, in similar language, in 1940 (L. 1940, ch. 574), to express the same prohibition as to sellers of industrial life insurance. Such statutes, directed against known and stated evils, are not to be stretched to cover situations having no real or reasonable relation to those evils (see McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], §§ 95, 141, 146, and cases cited; also *Kauffman & Sons Saddlery Co.* v. *Miller,* 298 N. Y. 38, 44, 45, and *Matter of Breen* v. *New York Fire Dept. Pension Fund,* 299 N. Y. 8, 19). This record exhibits no evil or abuse at all — rather, a normal, orderly application, to an existing wage dispute of collective bargaining and arbitration, in accord with modern custom and the settled public policy of this State. If those bargaining or arbitratory processes had begun and ended on a single day, no "retroactivity" of increase would have been needed, but the company would have paid just the same number of dollars it is now called on to pay. For this pay raise was retroactive in the sense only that it was ordered as of the day the machinery for fixing it began to function. To say that these statutes, which long ago did their job of outlawing bonuses and gratuities, can now be used to annul

so innocent and conventional a wage-fixing method, is to write new statutory law that the Legislature never heard of.

Equally untenable is plaintiff's contention that this retroactive pay raise comes within the *language* of the statutory ban. Plaintiff argues that there were in effect binding agreements fixing the agents' compensation during the period of the War Labor Board hearings. The record is to the contrary. The individual agency agreements existing before the disputes arose, and to which plaintiff points, were, by express covenants therein, terminable by the company on two weeks' notice, or by any agent on one week's notice. Notices, by the unions to the company, that present wages were unsatisfactory, and later negotiations, agreements and arbitrations, put an end to those agreements, under their own terms (for another reason for the same conclusion, see *Martin* v. *Campanaro,* 156 F. 2d 127, 129).

Only brief mention need be made of the argument that this result frustrates the intent of another statute, section 216 of the Insurance Law, likewise recommended by the Armstrong Committee, which section requires companies like plaintiff, annually to distribute their surplus earnings to their policyholders. That provision was complete in itself, and, as the committee report shows (Vol. VII, pp. 319–327) had nothing to do with the prohibitions against gratuities to agents. The award here was for proper wages actually earned, and no Legislature would, in any form or for any purpose, forbid their payment.

Our attention is called to a number of rulings, by the successive Superintendents of Insurance, applying section 213 to various situations. Only one is pertinent: the ex parte ruling by the present Superintendent that the statutes make unlawful the payments here contested. Of course, one such ruling could hardly constitute " long-standing administrative practice ". It was simply an opinion by a competent, qualified State officer, entitled to respect but not binding on the courts.

The judgment should be affirmed, with costs.

CONWAY, J. (dissenting). We have presented to us for determination a matter of statutory construction which reaches us as the result of a decision of the United States Court of Appeals for the Second Circuit in the case of *Paris* v. *Metropolitan Life Ins. Co.* (167 F. 2d 834, certiorari denied 335 U. S. 827). That

decision reversed a declaratory judgment of the District Court (68 F. Supp. 64) and remanded the cause to that court " with directions to retain the bill pending the determination of proceedings to be brought with reasonable promptness in the New York Supreme Court in conformity with this opinion." (167 F. 2d 834, 836, A. N. HAND, J.) The controversy hinged upon the construction and interpretation of sections 213 and 213-a of the Insurance Law of the State of New York, which sections, up to that time, had not been authoritatively discussed by the courts of this State. For that reason, the Circuit Court said (pp. 836–837) : " The situation disclosed in the case at bar is one where the State Court should be allowed to construe its own law because only its decision can be regarded as definitely authoritative and also because such a determination by the State Court might render it unnecessary to pass upon the constitutional question we have discussed. * * * If we should pass upon the question of statutory construction now, in the absence of any authoritative interpretation by the State, our decision might embarrass the State authorities in exercising important functions in regulating insurance. On the other hand, a decision by the State Court as to the meaning of the statute will be binding upon the parties and may obviate any necessity of determining constitutional questions which are present." In addition, reference was made to the position taken by the Attorney-General of the State of New York, as *amicus curiæ,* in asserting that the payments of compensation claimed by the plaintiffs in the *Paris* action were forbidden by the terms of the New York Insurance Law.

In conformity with the opinion of the Circuit Court, the Metropolitan Life Insurance Company (hereinafter called Metropolitan) commenced this action for a declaratory judgment and we must proceed with the limited task of construing the relevant sections of the New York Insurance Law, indeed that is all that is asked for in plaintiff's complaint and prayer for relief, leaving to the Federal courts the determination of the constitutional questions referred to by the Circuit Court of Appeals.

The dispute involves agents of the Metropolitan engaged in soliciting life and industrial insurance. The agents employed by Metropolitan in New York were represented by a local union (Local 30) affiliated with the United Office and Professional

Workers of America (UOPWA), which local union had been certified by the New York State Labor Relations Board as their exclusive collective bargaining representative. The agents employed by Metropolitan in the States of Massachusetts, Connecticut, New Jersey, Pennsylvania, Michigan and Illinois were represented by the parent union (UOPWA), certified by the National Labor Relations Board as their exclusive collective bargaining representative.

All these agents had entered into similarly worded, written agency agreements with the Metropolitan which defined their duties and specified the rates of commissions to be paid to them. (68 F. Supp. 64, 65.) In 1942, disputes arose between Metropolitan and the agents here regarding compensation and other matters. The dispute involving the New York agents was certified to the National War Labor Board on or about October 24, 1942. After hearings before the Regional Board for the Second Region, an order was made which was appealed by the Metropolitan to the National Board. The Metropolitan during and after the hearings had contended that the National War Labor Board had no jurisdiction over the dispute and, in addition, that it would be unable to comply with any retroactive provisions of an order of the board as to compensation of agents by reason of the above-mentioned provisions of the New York Insurance Law.

Nevertheless, in May of 1943, Metropolitan and Local 30 entered into a collective bargaining agreement fixing all terms of employment in dispute except that of compensation. Thereafter, six other similar collective bargaining agreements were entered into between Metropolitan and the parent union covering the agents in the other six States. Later all disputes were consolidated with the New York case. All seven agreements assumed the continuance up to the time they were signed, of the original individually executed agreements between Metropolitan and its agents prior to the time the disputes arose.

Then, in July of 1944, apparently because the question of retroactive pay had arisen during the proceedings before the board, and because Metropolitan had taken the position that compliance with any decision awarding retroactive pay increases would be forbidden by the New York Insurance Law and the New York Superintendent of Insurance, a stipulation (the full

stipulation will be found below[1]) was entered into between Metropolitan and the parent union, providing, among other things, that if the board awarded increased compensation prior to the effective date of a collective bargaining agreement anticipated in paragraph 1 of the stipulation, Metropolitan would not question the power of the board to make the order, nor that it was a final order, nor would it question the determination of the amount of the compensation involved, "but it will [would] question only its ability to make retroactive payment,

---

[1] Stipulation Between United Office and Professional Workers of America, C.I.O. and Metropolitan Life Insurance Company With Respect to Disputes Pending Before National War Labor Board.

1. The parties agree to enter into written collective bargaining agreements with respect to compensation covering all of the agents involved in the various disputes,— the agreements to be as of the date of the Board's order, and to provide for compensation in accordance with the provisions of the order.

2. If the directive order of the Board awards increased compensation, and if it awards such increased compensation retroactively, that is, prior to the effective date of the agreement provided for in paragraph 1, then Metropolitan agrees to deposit under the terms of the attached Escrow Agreement with Leon W. Berney of the United Office and Professional Workers of America, Cecil J. North of the Metropolitan Life Insurance Company and E. J. Nicholas of the Manufacturers Trust Company, as Escrowees, the amount of such retroactive increased compensation for all of the agents involved in the disputes for the respective periods for which they were involved, that is, from the respective dates as of which retroactive increased compensation was awarded in the several disputes, to the effective date of the agreement provided for in paragraph 1, to be held by the Escrowees pending the final determination of an action to be instituted in a court of competent jurisdiction of the question whether the provisions of Sections 213 and 213-a of the New York State Insurance Law constitute a bar to the payment by the Metropolitan to its agents of retroactive increased compensation.

3. Metropolitan will not question the power of the Board to make the order, nor that it is a final order of the Board, nor will it question the determination of the amount of the compensation involved, but it will question only its ability to make retroactive payment, in view of the provisions of sections 213 and 213-a of the New York State Insurance Law.

4. The Union agrees in consideration of Metropolitan's agreements contained in paragraphs 2 and 3, and the attached Escrow Agreement, not to apply to any governmental authority for the enforcement of the Board's order.

5. The Union shall have the initiative to choose the form of action or proceeding and the forum to test the legal question involved; but if the Union shall fail to bring such action or cause such action to be brought within ninety days after the date of the Board's order, the Metropolitan may institute such suit or proceeding.

6. Both parties will abide the final determination by the Courts with respect to the issue submitted to the Court.

in view of the provisions of Sections 213 and 213-a of the New York State Insurance Law.'' Metropolitan further agreed to deposit in escrow the amount of money required by the anticipated order for retroactive pay subject to a final determination by the courts with respect thereto.

In September of 1944, two months later, the National War Labor Board directed a weekly increase of $2.85 for the agents here — retroactive to the date of certification of the dispute to the Board. The period involved, therefore, is from October 24, 1942, to September 18, 1944, as to the New York agents, with some difference in date as to agents in the other States. Metropolitan, in accordance with its stipulation, raised no question as to the *prospective* increases awarded by the order and has paid them since. Likewise, pursuant to the stipulation, Metropolitan has deposited in escrow the sum of $792,318.19 covering the amount of the disputed *retroactive* pay. Since Metropolitan would be obligated to pay withholding taxes thereon, the total obligation of the Metropolitan, if it be determined that it has power to pay the retroactive increases, would be $1,004,000.

The position of the Metropolitan is simple and is based upon the literal meaning of the provisions of subdivision 7 of section 213 and subdivision 5 of section 213-a of the New York Insurance Law. (Sections 213, subdivision 7, and 213-a, subdivision 5, are quoted in full below[2]). The plain language of section 213 (subd.

---

[2] Insurance Law — § 213, subd. 7.

" No such company, and no person, firm or corporation on its behalf or under any agreement with it, shall pay or allow to any agent, broker or other person, firm or corporation for procuring an application of or a life insurance policy, for collecting any premium thereon or for any other service performed in connection therewith any compensation greater than that which has been determined by agreement made in advance of the payment of the premium, except that, if supervision over any outstanding life insurance by a local salaried representative of such company is discontinued, a premium collection or policy service fee may thereafter be paid on renewal premiums not exceeding two per cent of the renewal premiums actually collected on such insurance."

Insurance Law — § 213-a, subd. 5.

"No such company, and no person, firm or corporation, on its behalf or under any agreement with it, shall pay or allow to any agent, broker, employee or other person, for services in procuring an application for industrial life insurance, for collecting any premium thereon or for any other service performed in connection therewith, any compensation greater than that which has been determined by agreement made in advance of the rendering of such service."

7) expressly prohibits the payment by an insurance company to an agent of " any compensation greater than that which has been determined by agreement made in advance of the payment of the premium ". Section 213-a (subd. 5), applicable to industrial life insurance, likewise expressly prohibits the payment of " any compensation greater than that which has been determined by agreement made in advance of the rendering of such service." Each of these provisions clearly forbids the payment, under any circumstances, of *retroactive* increases in compensation, which, as the very word " retroactive " implies, are not and have not been determined by agreement made *in advance*. The agents, on the other hand, attempt to deny the applicability of these sections upon the ground that, despite the plain meaning and natural import of their language, the Legislature did not intend them to govern in a situation such as here presented. We think that this assertion is without warrant and that proper consideration of the essential relationship between insurance companies, their agents and policyholders, the circumstances surrounding the adoption of the predecessor of section 213 of the above-mentioned sections, the legislative and administrative history of those sections down through the years, and the special and peculiar characteristics of the life insurance business, compel the conclusion that the payment of *retroactive* increases in compensation by insurance companies to agents is expressly prohibited not only by the letter, but by the spirit and intent of sections 213 and 213-a of our Insurance Law.

In order to understand properly the necessity for, and the effect of, our present sections 213 and 213-a, we must look back to the circumstances surrounding the adoption of the predecessor of section 213 in 1906. That was section 97 of the Insurance Law and was added to the law and adopted following the so-called Armstrong Investigation in 1905. (L. 1906, ch. 326, § 33.) Prior to 1906, there had been many abuses of the powers of life insurance companies and their agents. So great had those abuses been that the Legislature, by concurrent resolution adopted July 20, 1905, appointed a Joint Committee of the Senate and Assembly to Investigate the Affairs of Life Insurance Companies. One of the counsel for that committee was CHARLES EVANS HUGHES, afterwards Chief Justice of the

United States. The testimony taken publicly during the investigation and finally printed in ten volumes, disclosed that, in the acquisition of life insurance business, contracts had been offered to agents by life insurance companies, or obtained by life insurance agents, under which extravagant commissions were paid so that in some instances more than 100%, in other instances more than 200% (Testimony before Armstrong Committee, [Legislative Insurance Investigating Committee, 1905, published by J. B. Lyon Co.], Vol. VII, p. 129), of the first year's premiums had been paid to agents and even commissions and advances totaling more than 100% of their first year's *business*. (Testimony before Armstrong Committee, Vol. IV, pp. 3450–3470). In addition, it was disclosed that clubs had been formed by agents in order that the *volume* of their business might be increased. Bonuses, prizes and rewards as well as increased and additional commissions and compensation based upon *volume* or *aggregate* of policies were offered by the companies. It thus became profitable for agents to advance to an insured a first year premium since, on occasion, by commissions and, on other occasions, by commissions plus bonuses, prizes, rewards, or increased or additional commissions or compensation based upon volume and aggregate of policies, the agent could receive back more than he had advanced to the insured as a first year's premium and, of course, there was no obligation on the part of the policyholder to pay any renewal premium thereon, since life insurance is paid for in advance. So shocking were the disclosures of the amounts of money paid by the companies to the agents, that the Legislature, upon receiving the report of its Joint Committee, decided to take firm action in controlling the amount of allowable expenses and the time of determination of the agents' compensation. The Legislature, as above noted, added a new section to the Insurance Law — section 97. (L. 1906, ch. 326, § 33.) The obvious purpose of the section was to limit strictly acquisition costs and expenses and, as a necessary incident thereto, to require the determination *in advance* of the com-

pensation of agents. The applicable portions of section 97, as it then read, are quoted below.[3]

The passage of section 97 was publicly opposed by the companies and at a public hearing in the Assembly chamber at Albany by the agents. That is not surprising for it will be evident upon thoughtful consideration of the legislative problem that it is extremely difficult to secure a true adversary relation between a mutual life insurance company principal, on the one hand, and agents soliciting business for such principal, on the other, in discussions concerning the amount of the agents' commissions or compensation, since the commissions or compensation ultimately come out of the dollars of the policy purchasers. The fact that there is here a realistic approach to an adversary relation between Metropolitan and its agents is a tacit commentary upon the wisdom taught by section 97, and its successors, in the last forty-four years.

---

[3] "L. 1906, ch. 326, § 33 * * *

§ 97. *Limitation of expenses.*— * * * No such corporation, nor any person, firm or corporation on its behalf or under any agreement with it shall pay or allow to any agent, broker or other person, firm or corporation for procuring an application for life insurance, for collecting any premium thereon or for any other service performed in connection therewith any compensation other than that which has been determined in advance. All bonuses, prizes and rewards, and all increased or additional commissions or compensation of any sort based upon the volume of any new or renewed business or the aggregate of policies written or paid for, are prohibited. No such corporation shall pay commissions upon renewal premiums received upon policies issued after the year nineteen hundred and six, in excess of five per centum of the premium annually for nine years after the first year of insurance in the case of endowment policies providing for less than twenty annual premiums, nor in excess of seven and one-half per centum of the premium annually for nine years in the case of other forms of policies; * * * provided further that in any agency district subject to the supervision of a local salaried representative the renewal commission payable to agents of such district shall not exceed two-thirds of the foregoing rates annually for nine years, subject to commutation as aforesaid; and also provided that a fee not exceeding two per centum may be paid for the collection of premiums which shall be received for any year after the tenth year of insurance. * * * A foreign life insurance corporation which shall not conduct its business within the limitations and in accordance with the requirements imposed by this section upon domestic corporations shall not be permitted to do business within the state. This section shall not apply to expenses made or incurred in the business of industrial insurance * * *."

The purpose of the Legislature, then, in adopting section 97, was to protect the dollars of the policyholders against both the company and its agents and to limit use of those dollars of the policyholders so that expenses would be kept within the bounds which the State of New York, as a matter of public policy, deemed and deems desirable. It is a unique statute. Forty-four years have passed since its adoption and no comparable statute, so limiting the expenses of a life insurance company, has ever been enacted by any Legislature in any other State in the United States despite in some instances in the case of companies not admitted to do business here (see, *infra,* p. 393) the costs of acquiring business have run to more than two and one-half times the first year premiums. New York stands alone. Our Legislature considered the limitation so vital to the interests of the public that it expressly forbade the Insurance Department of New York to admit to do business in this State among our people any life insurance company which did not meet the requirements of section 97 and its successors. The control over expenses through section 97 and later section 213 has been the keystone of the arch of life insurance supervision in this State for the last forty-four years.

Since 1906, the legislative and administrative history of section 97 emphasizes the wisdom and the continuing need for such a provision. Section 97 remained in much the same form until 1923, when it was broken down into subdivisions (L. 1923, ch. 209) as follows:

"3. No such corporation, nor any person, firm or corporation on its behalf or under any agreement with it shall pay or allow to any agent, broker or other person, firm or corporation for procuring an application for life insurance, for collecting any premium thereon or for any other service performed in connection therewith any compensation other than that which has been determined in advance.

"4. Except as hereinafter provided all bonuses, prizes and rewards, and all increased or additional commissions or compensation of any sort based upon the volume of any new or renewed business or the aggregate of policies written or paid for, are prohibited. Nothing herein contained is to be construed as prohibiting the institution of contests or competitions among agents, and the recognition of success in such competitions by

the awarding of ribbon decorations, medals, pins, buttons or other tokens of small intrinsic value, given not as compensation but as a bona fide recognition of merit.'' Prior to that, in 1913 (L. 1913, ch. 304, § 8), the exception quoted immediately above had been added to the portion of section 97 applicable to bonuses, prizes and rewards. Quite evidently, the sentences in section 97 which subsequently became subdivisions 3 and 4 had been aimed at separate and distinct evils and the *absolute* prohibition against recognition of merit in competition continued for but seven years.

The strictness with which the provisions of subdivision 3 of section 97 had been construed and enforced is made clear by the circumstances surrounding the amendment of that subdivision in 1929. Prior to that amendment, if a company discontinued the supervisory work of a local salaried supervisor, he could have nothing by way of compensation out of the renewal premiums paid upon policies written under his supervision because the agreement he had had with the company *in advance* was for a salary only. When we bear in mind that under section 97 a general agent receiving commissions was entitled to receive $7\frac{1}{2}\%$ of each of the first nine renewal premiums paid and $5\%$ of each of the next five renewals, it is clear that section 97 as written by the Legislature unfavorably affected the supervisor, whose supervision was terminated as a matter of company administration, for as long, potentially, as fourteen years of his future life (*in advance*) with the company since he no longer would receive a salary for supervision and yet if he became a general agent receiving commissions he would have no back-log of compensation from renewal premiums paid on policies written under his supervision but would have to start afresh and could collect commissions only on future business written by him. The result was undeniably harsh, but it flowed inevitably and inexorably from the plain wording of subdivision 3. No one suggested the argument sought to be employed in the instant case by defendants, viz., that, while the language of the section expressly prohibited payment, nevertheless, it should be presumed that the Legislature did not intend it to cover such a situation. Instead, when the matter came to its attention, the Legislature made the first amendment in twenty-three years to the applicable portion of section 97.

The exception then written into subdivision 3 is self-explanatory and reads as follows: (L. 1929, ch. 291, § 5, p. 736) " 3.  *  *  * provided that, if supervision over any outstanding insurance by a local salaried representative is discontinued, a collection fee not to exceed two per centum may thereafter be paid on renewal premiums actually collected on such insurance."

In 1928, the then Superintendent of Insurance, under Governor Smith, in his annual report to the Legislature for the year 1927, asked for amendments strengthening the provisions and the operation of section 97 so as to bring it up to date in controlling the expenses of life insurance companies. (N. Y. Legis. Doc. 1928, No. 33, pp. 9–10.)   He reported in part:

" *Limitation of Expenses of Life Insurance Companies*

" Sections 96 and 97 with their limitations of expenses and of total business written, enacted by the Legislature in 1906, were the principal result of the Armstrong Investigation and undoubtedly did more than any other element in stabilizing the life insurance business in this country and keeping it upon the high plane which it has enjoyed during the twenty-two years since its enactment.   Both sections have been amended from time to time, always with the idea of carrying out the principles established at that time.   The development of the business since then, however, has reached a stage where, in the opinion of the Department, it has become necessary that Section 97 especially should be revised.  *  *  *

" Some of the principal objects which a revision of Section 97 should accomplish may be summarized briefly as follows:

" 1. A more adequate control upon the compensation that may be classed as commission, paid for the production of new business."

In his annual report for 1929, under Governor Roosevelt, the Superintendent reported to the Legislature, under the title " *Acquisition Costs of Life Insurance* " (N. Y. Legis. Doc., 1929, No. 33, pp. 11, 12) : " At a meeting of the National Convention of Insurance Commissioners on September 27, 1928, it was suggested that a comparison of the acquisition costs of the companies subject to the expense limitations of Section 97 and of companies not authorized to do business in this State, and consequently, not subject to such expense limitations, would be of particular value in any discussion of the above subject. This Department undertook the preparation of such a comparison."

He then evaluated the results of the operation of the expense limitations of section 97. Among other things, he pointed out that, excluding industrial business, the ratio percentage, in 1927, of first year expenses to first year gross premiums of 215 life insurance companies not authorized to do business in this State was 75.5%, while the ratio percentage of 47 life insurance companies authorized to do business here, and thus subject to the provisions of section 97, was only 48.0%. He continued:

"The above figures are significant. It will be noted that the first year expense ratio of the companies not authorized to do business in New York is about 57% higher than the expense rate of the companies authorized to do business in this State. * * *

"These figures show conclusively that the expense limitations and other provisions of the New York Insurance Law have constituted one of the major factors in controlling acquisition expenses and in the remarkable progress of life insurance since the Armstrong investigation. This fact becomes all the more apparent when we analyze the figures for individual companies.

"Not a single company doing business in New York had a first year expense rate as high as 75.5% which is the average for the 215 companies not authorized to do business in New York. The highest first year expense rate for any authorized life company was 68.9%. Only two authorized companies had a first year expense rate higher than 58% and each of these was a small recently organized company.

| | | | | | | |
|---|---|---|---|---|---|---|
| 45 of 47 authorized Cos. had a 1st year expense rate less than | | | | | 58% | |
| 26 | " | " | " | | " | *48% |
| 19 | " | " | " | | " | 45% |
| Only 15 of 215 unauthorized Cos. had a 1st year expense rate less than | | | | | 58% | |
| " 7 | " | " | | | " | *48% |
| 122 of 215 unauthorized Cos. had a 1st year expense rate of | | | | | 80% or higher | |
| 65 | " | " | | | " | 90% " |
| 25 | " | " | | | " | 100% " |
| 10 | " | " | | | " | 125% " |
| 3 | " | " | | | " | 170% " |
| 2 | " | " | | | " | 258% " |

* The average first year expense rate for the 47 authorized companies.

Then followed another table which showed that the *renewal* expense rate for the 215 unauthorized companies was about 64% higher than the renewal expense rate for the 47 authorized companies.

Based upon that report and the legislation proposed to effectuate it, the Legislature enacted chapter 291 of the Laws of 1929, which became law, with the approval of the Governor, on April 4, 1929.

This report graphically illustrates the reason why it was so necessary for the State, acting through the Legislature, to control acquisition expenses. It was to protect the dollars paid by policyholders for insurance and to reduce for them the cost of their insurance. It was to control both companies and agents in the expenditure and receipt respectively of policyholders' money in the competition to get life insurance on the books of the company. While this was necessary as affecting stock companies it was even more necessary in the case of mutual life insurance companies where the assets are owned by the policyholders and the excess of premiums paid over expenses belongs to the policyholders. Since life insurance *is paid for in advance* to agents whose compensation is *fixed in advance* under section 97, the policyholder may terminate his policy by declining to continue payment of premiums if he is not satisfied with the amount of his money being used for expenses. That cannot be so with *retroactive* increases in agents' compensation.

In this case, the issue is not, except in a formal sense, between the managing officers of the Metropolitan and the defendant agents. Rather it is between the industrial policyholders, constituting a large portion of the owners of Metropolitan, on the one side, and the managing officers of Metropolitan and the defendant agents on the other. This cannot be a controversy at arm's length. Whether the National War Labor Board had any control over the dispute certified to it was never litigated. Plaintiff Metropolitan and defendant agents stipulated to be bound by the board's ruling insofar as prospective increases were concerned and then further stipulated to be bound by a decision of the courts as to whether sections 213 and 213-a prevented payment of retroactive increases. Whether Metropolitan could confer jurisdiction, if none existed, upon the National War Labor Board by stipulation, is not within

the issues presented to us here. It is more appropriate to say that the true adversary relation is between the Legislature seeking to protect the policyholders and to keep down the cost of insurance to them, on the one side, and the managing officers of Metropolitan, and the defendant agents, on the other.

To appreciate all this clearly, it is necessary to make reference to the character of life insurance, which differs from other forms of insurance, and especially to life insurance on the mutual plan (since Metropolitan is a mutual company).

Under the mutual plan, the company, in order to provide for unforeseen contingencies, fixes the premium at an amount in excess of that which the company anticipates will be really necessary to cover the cost of furnishing the insurance. The policyholder pays that amount for the insurance in advance but later receives back, in the form of so-called " dividends ", the overpayments, if any, made by him in respect of each year's premium, and thus obtains the insurance at actual cost. (*Barnett* v. *Metropolitan Life Ins. Co.*, 285 N .Y. 627.)

Because of payments for death claims, due to advancing age of policyholders insured, the company must provide for the creation and maintenance of an adequate reserve on life insurance policies. The reserve requirement referred to is the " legal reserve " under section 205 of the Insurance Law. Any legal reserve, when fixed and established by law, is final and when set up, may never be invaded. If there be impairment of it, there is insolvency of the company. In industrial insurance, since the premiums paid by the policyholder during the first year are not sufficient to pay more than the expenses of acquisition and the cost of insurance coverage for the year, the legal reserve is borrowed temporarily from " surplus " as against the time when " profits " will be thrown off from the renewal premiums in that policy and thus will enable the amount borrowed to be restored to " surplus ". (Industrial Life Insurance. Louis H. Pink, Superintendent of Insurance of State of New York, Recommendations to Joint Legislative Committee for Recodification of the Insurance Law, Oct. 24, 1938, p. 14.)

This adequate reserve, together with future premiums to be received and with compound interest at the rate assumed, should be just sufficient (no more and no less) to discharge all death claims arising under the policies, if (a) such claims occur precisely as assumed in the mortality tables upon which the

calculation of the premiums was based, and if (b) the interest earned is correctly anticipated, and if (c) the expenses are exactly as assumed in the calculation of the premiums.

The plaintiff, like all life insurance companies similarly situated, in the calculations of its premiums has deliberately endeavored by over-conservatism, to accumulate more funds than the minimum reserve required by law and its other liabilities. The excess so accumulated is called the " surplus ". It is not a true " surplus ". It is an overpayment of insurance. Part of this " surplus " is held back by the directors as a contingency reserve for the protection of the policyholders against depreciation of securities, for temporary excessive mortality, for such additions to reserve as may be required (for instance, by the Superintendent of Insurance by reason of unforeseen bad experience) and for other unpredictable contingencies.

The balance of the " surplus ", after setting up this contingency reserve, constitutes the divisible surplus, on the basis of the particular mortality tables and interest rate assumed in the calculation of the reserve. In mutual life insurance companies, the whole of the divisible surplus must *each year be apportioned equitably* among all the policyholders entitled to share therein. (Insurance Law, § 216; *Rhine* v. *New York Life Ins. Co.*, 273 N. Y. 1; *Rubin* v. *Metropolitan Life Ins. Co.*, 278 N. Y. 625; *Barnett* v. *Metropolitan Life Ins. Co.*, *supra.*)

Thus, in a mutual company, " profits " is another name for " gross surplus ", which is, as noted, contingency reserve plus divisible surplus. These so-called " profits " can arise from only three general sources:

(1) *Savings from mortality.* If it was figured in the net premium that the mortality cost for the year would be $10 and it actually was only $8 or $9, there would be a saving or " profit " of $1 or $2 per thousand dollar policy on similar policies for a particular age.

(2) *Excess interest earnings.* Since the net premium was figured on an assumed interest basis, if the actual interest income was one half of 1% greater, the extra ½% would again be " profits ".

(3) *Savings on expenses.* If the net premium had been " loaded " for business expense, for instance, at a rate of

25 cents per $1,000 of insurance outstanding in excess of the amount actually spent, there is a saving of that amount per $1,000 policy. This again is a so-called " profit ".

" Profits " arising in any one of these ways really constitute overpayments of insurance by those insured. As noted, the " profits " can only arise from one or more of the three sources listed. Obviously, the Legislature cannot determine mortality. That is a matter beyond us. Nor can it fix interest rates. They are affected by national and international economic conditions. One State may not regulate them for the nation or the world. That leaves only one source of profits: Savings on expenses. The Legislature has sought to control expenses by strong and vigorous action, since 1906, by means of the provisions of section 97, as embodied now in sections 213 and 213-a of the Insurance Law. The Legislature has commanded that agents' compensation be determined by agreement in advance. It has in effect ordered a savings on expenses, thereby lowering the cost of the insurance to the policyholders, and further, it has assured policyholders of *advance* knowledge of the exact amount of money which will be used for expenses. Since they pay for life insurance *in advance,* they can stop payment for it *in advance.* It cannot be so with retroactive increases of compensation.

In May of 1937, the Legislature adopted a joint resolution that a joint legislative committee be created to make a comprehensive study and analysis of the insurance laws of the State for the purpose of ascertaining weaknesses and defects therein and revising, clarifying and recodifying them. Assemblyman R. FOSTER PIPER (now an Associate Justice of the Appellate Division, Fourth Department) became chairman of the joint committee. The committee hereafter will be referred to as the Piper Committee. In 1938 the powers of the committee were increased to include specifically *the contractual relations of life insurance* companies with their agents. (N. Y. Legis. Ind., 1938, p. 610). In that same year, 1938, Local 30 was certified as the bargaining representative of the agents of Metropolitan for New York City, Long Island and Westchester. As permitted by a provision of the joint resolution, the committee was attended by, among others, the Superintendent of Insurance and by representatives of the agents and officers of their collective bargaining agents. In 1937 (L. 1937, ch. 443), one year

before, the Legislature had adopted article 20 of the New York State Labor Relations Act which became effective as of May 20th of that year. *That statute made no provision for retroactive payments of increased compensation between the commencement of a labor dispute and its termination by a collective bargaining agreement.* It must be remembered that no question is here raised by Metropolitan as to increased *prospective* compensation after collective bargain made.

The representative of Local 30 who spoke before the Piper Committee on October 25, 26, 1939, stated frankly that in proposing an amendment to section 40 in March of that year he had had in mind the State Labor Relations Act guaranteeing " to the employees of any corporation in New York State the right to collective bargaining " (Public Hearing, Joint Legislative Committee for Recodification of the Insurance Law, Oct. 25, 26, 1939, p. 206). Nevertheless he fairly conceded in what was a proper and statesmanlike approach (p. 211): " As we pointed out in March, one body, such as the State Labor Board, does not exclude some other body such as the New York State Insurance Department, having the power to enforce a particular set of rules upon a company."

On the same day Chairman Piper, apprised of the fact that a problem in collective bargaining might be involved affecting proper action by the Legislature in legislating both as to labor law and insurance law, offered to transmit to the committee on labor relations (the so-called Ives Committee) the matters on which the representative of Local 30 had given testimony that day. The representative of the New York State agents, replying, in effect declined the offer saying (p. 220): " That is correct, normally. Insurance, we think, is not the same as any other normal business. Insurance has no private owner. I think that it has been adequately brought out in many committee hearings, both here and in Washington, that the people in control of the insurance companies have no private interest in those companies, except in so far as their salaries are concerned. I think that is behind the revision of the law and of the original law of insurance, that is the Department should be in control, because it is a public institution, for regulation, and we say that if this Department is to regulate insurance, it will have to regulate the very basic element, and that is the contract between the public and the individual actually conducting the business of the company." (See for full discussion,

pp. 219–223.)  He further pointed out (p. 221) that it was a mat-
ter of *protecting the interests of the public*" which is the purpose
of limiting the expense of insurance.   *   *   *"   Whether a
change in attitude came later due to the consolidation with the
New York case before the National War Labor Board of the
cases affecting the agents in the six other States listed above
or for some other reason, does not appear in this record.

The Piper Committee as a result not only did not refer the
matter of collective bargaining in connection with the con-
tracts of agents with a life insurance company to the Ives
Committee but on the contrary did that which had not thereto-
fore been done in legislative history.  It added section 213-a to the
Insurance Law and thus expressly limited the expenses made
and incurred in industrial life insurance.  In section 97 as
originally enacted in 1906 industrial life insurance was *expressly*
excepted from the provisions of the section.  That exception
continued until after the hearings before the Piper Committee
to which reference has been made immediately above.  Not
only did the Legislature provide in subdivision 5 of section
213-a that no compensation might be paid to an industrial agent
greater than that which had been determined by agreement
made in advance but, as indicating the distinct and different
purview of subdivision 5 and 6 of section 213-a, it provided
in subdivision 6 a prohibition against payment of any bonus,
prize, or reward for volume of business similar to that found
in subdivision 8 of section 213.  That action of the Legislature
was aimed directly at the controversy which has eventuated in
this present action but which was then merely potential.  That
action was also aimed directly at Metropolitan since it is the
only domestic life insurance company, mutual or otherwise,
writing industrial insurance in this State.  The following is
contained in the Report of the Piper Committee for 1940
(N. Y. Legis. Doc., 1940, No. 84, p. 10).

*" Limitation of Expense of Industrial Insurance*

" Assembly bill, Int. 531, Pr. 2511; Senate companion bill,
Int. 471, pr. 2237.  This provides for a new section 213-a which
limits the expenses in connection with industrial life insurance.
As a result of the Armstrong Investigation, the Legislature of
this State passed a bill limiting the expenses of life insurance
companies generally, but this was not applicable to industrial

life insurance. At the time of the report of the Armstrong Committee, industrial life insurance in this country was in its infancy, and it was not given serious study by that committee. This bill follows generally the provisions of the section of the Insurance Law (section 213), in relation to limitation of expense of life insurance companies, but of course the percentages of expenses in certain instances must of necessity be higher with industrial insurance, particularly due to the cost of collection of premiums at the home, and other peculiar conditions surrounding this business.

" This bill has passed both houses and is now before the Governor."

It was promptly signed by Governor Lehman on April 17, 1940 and became section 2 of chapter 574 of the Laws of 1940.

Industrial insurance is the insurance which is purchased by those in the lowest income brackets. It is disturbing to the socially conscious that the very poor who are dependent on this form of insurance must pay the highest price for protection. It is indeed the most costly of all life insurance. It is necessarily more expensive than an ordinary life policy, the premiums for which are payable in fewer installments, for when paid for weekly the agent calls to collect the premium at the insured's home each week. It is the type of policy which customarily requires no medical examination. It fills an important need, however. Thus, in the Report of the Piper Committee to the Legislature in 1939 (N. Y. Legis. Doc., 1939, No. 101, p. 16) it was disclosed that the number of industrial policies issued and in force in this State at the end of 1937 by Metropolitan and three out-of-State companies was 13,580,000, of which number Metropolitan had written 43%. The amount in force was $3,813,000,000. In other words, the number of industrial policies in force in this State then exceeded the number of persons resident here. In the report, just mentioned, the Piper Committee reported to the Legislature that the " subject of agents' collection costs requires additional study by the committee to determine some means of reducing this excessive cost of industrial insurance " (p. 17). That was one year before the committee recommended that industrial insurance, for the first time, be limited in its expenses by the addition of section 213-a to the Insurance Law.

The average premium paid for industrial insurance in this State in 1940, the year section 213-a was added to the Insurance Law, was 20 cents weekly and the average amount of insurance per weekly premium policy was about $225. (Superintendent Pink, Recent Developments in Industrial Life Insurance, New York State, Dec. 10, 1941, p. 10.) The Legislature has now eliminated the writing of industrial endowment insurance in this State and has prohibited the writing in New York State of a policy of weekly premium industrial insurance where such policy would make the total amount of such insurance on a life greater than $1,000, due to the heavy cost of this type of insurance. (Insurance Law, § 201, as amd. in 1940.) The present endeavor is to induce purchasers of industrial insurance to pay monthly rather than weekly premiums.

Thus the Legislature has finally provided for the limitation of expense in the writing of industrial insurance. The industrial department of Metropolitan must stand upon its own feet, just as must the ordinary department, in setting up its reserves, providing its " surplus " and paying its acquisition costs and total expenses. Those items are allocated to each department. It is not proper to urge, as do defendants here, that it is quite all right to pay this $1,004,000, from the ordinary department and the industrial department of Metropolitan, and it must come from both, since what they term a " ceiling " of permissible expenses under sections 213 and 213-a has not been reached. To argue thus is to disclose a complete misconception of the legislative purpose in orginally enacting section 97, now section 213, and section 213-a in 1940. As the Armstrong Committee pointed out in 1906 (Report of the Joint Committee of the Senate and Assembly, Assem. Doc., 1906, No. 41, p. 399):

### " EXPENSES

" The Committee deems it inadvisable to recommend that the Legislature attempt to prescribe the expenditures of insurance corporations. The Legislature cannot undertake the management of the business. In seeking to secure economical administration it should not over-step the line which divides suitable State supervision from an utterly impracticable effort to prescribe details. The Legislature should aim to permit freedom of management subject to general regulations and complete publicity."

Section 97 was passed in 1906. It was strengthened in 1929. It was strengthened further and extended in 1940. The purpose of the Legislature was to make life insurance cheaper for the policyholder. True the Legislature could not prescribe details and had to provide a so-called " ceiling " beyond which the life insurance companies could not spend. The Insurance Law provides that rates shall be both reasonable and adequate. (Insurance Law, § 205, formerly § 84; § 206, formerly § 85; also note § 183, subd. 1, par. [b], formerly § 67). The Legislature had to prescribe also a " floor " so as to protect the necessary statutory legal reserve requirement. The nearer, under legislative prodding, life insurance companies can approach the " floor " the cheaper will be life insurance for the policyholder. The argument by defendants that the payment of the $1,004,000, now sought from the ordinary and industrial departments may be properly made because it is under the so-called " ceiling " is to attribute to the Legislature the granting to a life insurance company and its agents of the right to divide up the policyholders' dollars up to the " ceiling " when that was specifically what the Legislature was endeavoring to deny to them. If that argument be valid, then this is the first million which may be obtained by the company and agents in this State through this pattern or formula in bypassing sections 213 and 213-a, but there are many millions more available for division. If that is to be accomplished it is for the people, through their legislative representatives, to do it by amending those sections and not for the courts which must accept, as written, unambiguous words embodying legislative will.

The judgments of the Appellate Division and Special Term should be reversed, with costs and judgment should be granted for the relief prayed for in the complaint.

Loughran, Ch. J., Dye, Fuld and Froessel, JJ., concur with Desmond, J.; Conway, J., dissents in opinion in which Lewis, J., concurs.

Judgment affirmed.