### UNITED STATES v. McDONALD et al.

(District Court, N. D. Illinois. August 22, 1893.)

Post Office—Nonmailable Matter—Lotteries—Bond Investment Schemes.
   A bond investment scheme, according to which only a limited few, who are determined by the order in which their applications are received, are certain to receive a return, and the rest are dependent for any return, and for the time thereof, upon the probability that the great majority will permit their bonds to lapse, is a scheme in which the prize is dependent on chance, and constitutes a "lottery," which it is criminal to advertise through the mails.

At Law. Indictment of George M. McDonald and others, officers of the Guarantee Investment Company, for violation of the lottery act of September 19, 1890, (26 Stat. 465.)

Thos. E. Milchrist, U. S. Dist. Atty.

Collins, Goodrich, Darrow & Vincent, and L. S. Metcalf, for defendants.

GROSSCUP, District Judge, (charging jury orally.)   The statutes of the United States, gentlemen of the jury, provide that any person who shall knowingly deposit or cause to be deposited, send or cause to be sent, through the mails, any letter, postal card, or circular concerning any lottery, so-called gift concert, or other similar enterprise, offering prizes dependent upon lot or chance, shall be guilty of a misdemeanor.

The indictment, in the first and second counts, charges these defendants with having deposited, or caused to be deposited, sent, or caused to be sent, through the United States mails, certain letters or envelopes concerning a lottery, and in the third count it charges the defendants with having sent, or caused to be sent, through the United States mails, certain papers, pamphlets, or circulars concerning a lottery.

The proof shows that two letters were sent through the department to the defendant George. M. McDonald, president of the Guarantee Investment Company, asking him, in substance, for such printed matter as he might wish to send the writer concerning the business and purposes of his company; and, in response thereto, envelopes and printed matter were deposited in the mails, directed to the individuals by whom the information was asked.   The proof also shows the responses were put in the mails by defendants, or by clerks under the direction of the defendant in the case, and in furtherance of a practice under which like circulars and literature were habitually sent through the mails by this company in response to inquiries.

If you are satisfied of these facts upon the proofs beyond a reasonable doubt, (and no contradiction of them is attempted by the defendants now on trial,) it will be your duty to find a verdict of guilty, provided the papers inclosed in these envelopes concerned a lottery, or enterprise similar to a lottery, or gift concert, offering prizes dependent upon lot or chance.   What, then, is the scheme or enterprise which this printed matter is calculated to promote?

The Guarantee Investment Company is an incorporated organization under the laws of the state of Missouri, which empower it to issue bonds and securities, hold real estate, and make investments thereon.   The whole purpose of the company, however, seems to be to issue so-called bonds.   For this purpose it maintains an office in St. Louis, and has agents throughout the country to induce people to buy these bonds.   To the applicants are issued bonds of the company, being issued in consecutive numbers from one upwards, in the exact order of the imprint chronologically, said to have been made by an electrical contrivance attached to a clock.

For these bonds the applicant has already paid $10, a portion of which goes to the agent as his commission, the remainder to the company for its maintenance, and he has agreed to pay each succeeding month, for each bond purchased, $1.25 more, the 25 cents to be retained by the company for its maintenance, and the $1 going into the treasury, or so-called trust fund, for the redemption of the bonds.   The trust fund is also increased by certain fines imposed for deferred payments and other delinquencies.   For this the applicants receive the promise of the company, embodied in the bond,

that out of the redemption fund they will respectively receive, for each bond held, $1,000, the payment to be made in the following order:

First, bond No. 1, then bond No. 5, then bond No. 2, then bond No. 10, and so on, the priority alternating between the unpaid bonds bearing the lowest absolute number and the unpaid bond bearing the lowest number divisible by five, one class being known as numerals and the other class known as multiples. In instances where bonds have lapsed for nonpayment of premiums, the next lowest bond takes its place. The so-called trust fund is said to be kept in the treasury, excepting $100,000, which is deposited in the state of Missouri with some of the officers of that government. It seems to be no part of the scheme to invest this money, so as to enlarge the bulk by interest or other increment.

Now, does this constitute a lottery? There is no doubt, gentlemen, upon the face of it, that it constitutes a cheat. The testimony shows that this company has been in existence now for two years, and has had 50,023 applications. According to the constitution of its organization, it has therefore received more than half a million dollars from the $10 preliminary fee. The testimony shows that it has paid out $206,000 from the so-called trust fund. If it had paid out all it received, as the constitution of the company required it to do, then it has received, as maintenance from the dues, more than $40,000. Therefore, after an experience of two years, the officers and the stockholders have received more than $500,000, and its so-called beneficiaries have received but $206,000. That is plunder of the public. It is said that this has been done fairly. The court, of course, is not sitting here to pass upon the fairness of any such transaction. Two hundred years ago, when coaches were robbed by highwaymen on the heaths of London, it was always said that the highwaymen acted with courtesy, but nobody but an ignorant fool returned to London without knowing he had been plundered. But that does not prove that it is a lottery. It may be a cheat, but we must ascertain by the legal canons and definitions whether it is a lottery. What is a lottery? The best definition I can find for it is this: Where a pecuniary consideration is paid, and it is determined by chance or lot, according to a scheme held out to the public, whether he who pays the money is to have anything for it, and, if so, how much, that is a lottery. You will see, therefore, that the elements of this definition are two: First, that the party who pays the pecuniary consideration must have a return,—a prize; second, that that return or prize is determinable by lot or chance.

Now, every enterprise in which we engage has a return or prize, or is supposed to have. That is the incentive which makes men industrious and active. Whether that return or prize be determinable by mere lot or chance makes it either a legitimate enterprise, or a lottery, and therefore an unlawful enterprise. We perhaps can illustrate that best by referring to some of the schemes of life in which men are engaged. Take, for instance, the life insurance companies,—those that proceed either on the stock plan or on the

assessment plan. They require of the member that he pay in a certain amount of money. That is the pecuniary consideration. That money is invested, or supposed to be invested, in securities, and, when the member dies, a certain amount, stipulated in the policy, is paid to his heirs or the beneficiary named in the policy. That is the return. The man may have been insured but a month, and have paid in but a few dollars, and have received back $5,000 or $10,000. In such instances as that, a much larger sum has been returned than the consideration, but the fact that there was such a return does not make it an unlawful enterprise. Why? Because the prize is not determinable by, or dependent upon, chance or lot. It is dependent upon the life of a man, and the life of a man is determined by the laws of nature, and not by the chances of lot.

A man who makes an investment in real estate may put in a few thousand dollars, and take out a million. What he puts in is the consideration; what he takes out is the prize. It may be a hundredfold larger than what he puts in, but on what is it dependent? Upon the growth of the town in which he lives; upon the growth of public sentiment respecting the value of property in that particular locality; upon the law of growth, which is itself a natural one,—an industrial law. But suppose a man puts a ticket in a hat with a hundred other tickets, and then it is drawn by a blindfolded man, his chance of the prize offered is dependent upon that drawing. The ticket may cost but 50 cents. The prize may be worth $10,— much larger than the price of the ticket, though not larger in proportion than the life insurance policy or the real estate investment. But the getting of the prize is dependent upon the chance or lot of his ticket being drawn, not upon any natural law, as a man's life, nor upon any industrial growth, as the growth of the value of real estate. This illustrates to you the difference between legitimate investments, which may yield, according to the good fortune of the investor, a hundredfold more than the amount invested, and a gambling investment, according to a lottery, which can only yield in case the allotment or chance, which is purely artificial, turns in his favor.

In the case at bar the return or prize is $1,000. Now, is that determined by lot or chance? Is it determined by one of the laws of nature, or of industrial growth, which determines the other returns of life? Let us look at the practical workings of the scheme. Let us look at it, first, independently of what is called the multiple system. Here is a company which in two years has taken in more than 50,000 applications. In order to make a return certain to each one of these applicants of the amount of money promised in the bond, it would be necessary that the company should have a fund of $50,000,000. In two years they have only accumulated a fund of $206,000. According to the constitution of the company, outside of lapses, there are 50,000 men who are entitled to these returns if they persist in paying. In two years, 206 have been paid. If each man were to get a return according to the promise of the company, outside of lapses, and every dollar which went into the fund of the company were to be used for that purpose, and no man to receive more

than what he paid in, it would take 1,000 months, or more than 83 years, for each man to receive back his return. This money would be idle, not growing by interest or other investment. Is it not perfectly apparent that from the very necessity and constitution of the scheme, if the multiple system were not introduced, the company could not go on, and no man would receive back anything except those who had been the fortunate possessors of the first bonds?

It is said—and is one of the boasts of the company—that everybody who has been paid back has been paid $1,000 on an investment not to exceed $30. That again shows the entire impossibility, according to the constitution of the scheme, of but a limited few—one in a hundred—ever receiving any return, or prize, except for the lapses; because money lying idle in the treasury, shorn in the first place of 20 per cent. of the amount, will never grow to pay 1,000 to 1, or 1,000 to 30, so long as the present economic law of the universe prevails. These defendants have foreseen this, and foreseen that the company must therefore come to an immediate end, and have instituted what is called the multiple system. Thereby a chance is held out to men, even after the company has grown to be 50,000, to receive an early payment of their bonds. But upon what is that chance dependent? What determines that return or prize? Any law of nature or of industrial growth, such as applies to insurance companies or real estate investments, which I have used as illustrations? Not at all. It is solely dependent upon the order in which his bond may go through the registration process. If he draws a multiple, and the company continues, he eventually will be paid. If he draws a numeral, it is as morally certain as any law of the universe that, unless the company is almost entirely abandoned by its bondholders, he will never be paid.

It is said here in argument that the lapses will secure certain payment in time; in other words, enough men will become discouraged at the outlook, and will drop out, so as to advance those whose bonds are deferred. What does that mean? It means that by the very constitution of this company the success of its enterprise depends entirely upon its insolvency,—its gross and well-known insolvency,—so insolvent that in the very method of its organization no hope of its carrying out its promise can be entertained. Now, the court cannot say that that is a legitimate enterprise, promising a certain return of money, which, by the very constitution of the company, is dependent upon the insolvency of the company and a wholesale repudiation of its promises. That is not the rule of any other legitimate enterprise. The determination, therefore, of the return or prize, is dependent upon a chance or allotment.

The only substantial difference between the scheme disclosed to you by the proof and the well-recognized lotteries of the world, such as the Louisiana Lottery Company, is that the latter are, in comparison, honest and free from the opportunities of chicanery. The wheel of the lottery and the hat of the raffle are to the fortune hunter incomparably fairer contrivances for the determination of his chances. He is not dependent in them upon the honesty or accuracy of a secretary, with whom it is as easy to put one application through the

register as another. The whole scheme disclosed by the proof is a cunning trick to attract the cupidity and ignorance of men.

A great menace to the civilization not only of the United States, but of the world, is the growing tendency to gamble or engage in lottery. Two hundred years ago their promoters were characterized in the statutes of England as rogues. No prospect is so attractive as that which is wrapped up in the mysteries of a chance. To the winner comes some money, many congratulations, wide advertisement·throughout the newspapers, and the propensity to go in again. To the losers, one hundredfold in number, come stripped homes, impoverished wives and children, lost opportunities of building up a competence legitimately, and, in too many instances, the temptation to go in again upon means that are obtained from an employer or cestui que trust, first by a supposed borrowing, then by intentional theft, forgery, and embezzlement. The rainbow of hope lures and lures until its chaser falls over the precipice into suicide or the penitentiary.

The mails of the United States are intended for legitimate business or friendly communication, and are defiled by the dissemination and promotion of such a scheme as the evidence in this case admittedly discloses.

If you believe, beyond a reasonable doubt, that these defendants deposited the printed matter submitted to you in the mails, as charged in the indictment, and that the scheme which it promoted was of the nature and character sworn to indisputably here by the witnesses, then it is your duty to return a verdict of guilty.