### PUBLIC CLEARING HOUSE v. COYNE, Postmaster.

(Circuit Court, N. D. Illinois, N. D. January 23, 1903.)

#### No. 26,538.

1. USE OF MAILS—FRAUD ORDERS—LOTTERY SCHEME.

Complainant was the fiscal agent of an organization called the "League of Equity," in which each member, on joining, paid an entrance fee, which went to complainant, and $1 per month so long as he remained a member. Ten per cent. of this was also kept by complainant, and the remainder paid into a fund, which was held without investment until a time fixed, when it was divided equally between the members who had been such for five years, who thus received 90 per cent. of the money they had paid in and of that paid in by new and lapsed members. The amount received, if any, depended upon the chance of getting in new members. If none were obtained, no money would be paid to certain ones of the existing membership. *Held*, that the scheme was, in effect, a lottery, and one which must in the end amount to a legal fraud, and that the postmaster general was justified in issuing an order classifying it as fraudulent, in the exercise of the power given him by statute.

2. SAME—CONSTITUTIONALITY OF STATUTE.

Rev. St. § 3929, as amended by Act Sept. 19, 1890, c. 908, § 2, 26 Stat. 466 [U. S. Comp. St. 1901, p. 2686] and Rev. St. § 4041 [U. S. Comp. St. 1901, p. 2749], approved by Act March 2, 1895, c. 191, 28 Stat. 963 [U. S. Comp. St. 1901, p. 3178], giving the postmaster general the power, upon evidence satisfactory to him that any person or company is engaged in conducting a lottery or fraudulent scheme, to prohibit the delivery of registered letters or the payment of postal orders to such person or company, or his or its agents, are not unconstitutional, as an invasion of personal rights.

In Equity. On exceptions to master's report.

D. I. Sicklesteel, for plaintiff.

S. H. Bethea, for defendant.

¶ 1. Nonmailable matter relating to lotteries, see note to **Timmons v. United States, 30 C. C. A. 90.**

¶ 2. See Post Office, vol. 40, Cent. Dig. § 21.

KOHLSAAT, District Judge. The bill herein was filed to restrain the defendant from interfering with complainant's mail. An answer was filed, and the cause referred to the master. This hearing comes before the court on exceptions to the master's report.

The defendant, postmaster at Chicago, withholds complainant's mail under and by virtue of the so-called "fraud order" of the Postmaster General, issued in accordance with the provisions of section 3929 of the Statutes of the United States, 1890, c. 908, § 2, 26 Stat. 466 [U. S. Comp. St. 1901, p. 2686], and section 4041 of the same statute [U. S. Comp. St. 1901, p. 2749], approved March 2, 1895, c. 191, 28 Stat. 963 [U. S. Comp. St. 1901, p. 3178], entitled an act to amend certain sections of the Revised Statutes relating to lotteries and for other purposes, approved September 19, 1890.

Complainant is the fiscal agent of a co-operative organization known as the "League of Equity," the object of which seems to be to co-operate for the purpose of furnishing each other a substantial realization in accordance with a certain table, called the "ordinary causation and realization table." The plan seems to be somewhat as follows: Each member of the league is required to pay a $3 initiation fee on joining and $1 per month thereafter, so long as he remains a member of the league. This $3 and 10 per cent. of the monthly payments are retained by complainant as its compensation for acting as such fiscal agent. The balance of the monthly payments is held by complainant without investment, until the realization period. This is fixed at the end of five years. The League of Equity was successor to a like organization known as the "League of Educators," which was successor to a like organization known as the "League of Eligibles." The membership of the League of Equity numbers about 5,000. After deducting the charges aforesaid, the balance is equally divided between the members who have been in the league five years, provided, however, that any member who brings in three new members in any one year is entitled to receive at the end of one year onefifth of what he would be entitled to receive at the end of five years. This concession seems to be made in order to encourage missionary work in getting new members. The only source of increase upon the money paid in consists of the money paid by new members. Thus, if the present membership is 5,000, and during the next five years 5,000 more members shall be secured, the realization fund will consist of what the present membership has paid in, plus what the additional members have paid in, less 10 per cent. This would be equally divided among the original 5,000, while the new 5,000 would have to realize from the new members thereafter secured at the end of another five years. Thus the first 5,000 get nine-tenths of their own money back, and, in addition, nine-tenths of the funds paid in by the new members at the end of the five-year period. Should any of the members drop out, their money goes to those who remain. The first class feeds upon the second, the second upon the third, and so on to the collapse—a literal demonstration of the old saying, "The devil take the hindmost."

It seems strange that material can be found to keep such a scheme going, but it is in evidence that the predecessors of the League of

Equity, up to about November 1, 1902, had collected about $137,-390, and divided it. There is no claim that complainant had not acted fairly and honestly with the funds it has so handled. The evidence shows the contrary. The scheme is, in effect, a lottery. The master so finds. It has been widely and alluringly advertised by the complainant, and has captured a vast number of "get-rich-quick" people. An attempt has been made to compare it with the benevolent life insurance associations. The analogy cannot be sustained. In the latter case, aside from the sentiment which justifies a gift from all for the loss of the one, the realization is not dependent upon chance or lot, but upon the life of a man—upon the laws of nature. U. S. v. McDonald (D. C.) 59 Fed. 563. In the case at bar, as the master aptly expresses it, the only difference between this and the ordinary lottery is that in the ordinary lottery the amount of the prize is fixed in advance, and the prize drawers are determined by lot, whereas in this plan the prize drawers are determined in advance, and the amount of the prize by lot or chance.

The scheme also amounts in the end to a legal fraud, or so near to it that the Postmaster General, upon the evidence that the record shows was presented to him, had a right to issue the fraud order in question.

I am therefore of the opinion that the Postmaster General acted within the authority given him by the statutes cited, and that the exceptions to the master's report should be overruled. Nor do I consider the point as to the unconstitutionality of the said acts well taken. While the rights of all citizens under the postal laws should be sacredly protected, yet this cannot be done while at the same time the public is exposed to tempting schemes of fraud, brought to it by this great and beneficent governmental convenience. In a case like the one at bar the consonance of such a law with the spirit of the Constitution is very apparent.

The exceptions are overruled, the report of the master confirmed, and the bill dismissed for want of equity.