250 F.2d 221
 Harvey L. WELLS and Harry J. Albertsen, on behalf of themselves, and others similarly situated, Appellants,
v.
J. C. PENNEY COMPANY, a corporation, and The Chase Manhattan Bank, a corporation, successor in interest to the Chase National Bank of the City of New York, Appellees.
 No. 15125.
 United States Court of Appeals Ninth Circuit.
 November 20, 1957.
 
 1
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED King, Miller, Anderson, Nash & Yerke, Ralph H. King, Frederic A. Yerke, Jr., Paul R. Meyer, Portland, Or., for appellants.
 
 
 2
 Koerner, Young, McColloch & Dezendorf, Clarence J. Young, Wayne Hillard, Portland, Or., Pell, Butler, Curtis & LeViness, W. H. Dannant Pell, Henry Stone, C. Robert Roll, New York City, for appellees.
 
 
 3
 Before STEPHENS, Chief Judge, BARNES, Circuit Judge, and LINDBERG, District Judge.
 
 
 4
 LINDBERG, District Judge.
 
 
 5
 Appellants[1] brought this action against appellees attacking the J. C. Penney Company Profit-Sharing Retirement Plan (for Management Staff), hereinafter referred to as "Plan" on the ground that such Plan so far as it pertains to the awarding of capital stock of the J. C. Penney Company, hereinafter referred to as "Penney", is illegal and void and of no effect since it is, in effect a wagering contract, lottery or tontine contract prohibited by the constitution, statutes, laws and public policy of the state of New York. Jurisdiction is based upon diversity of citizenship.
 
 
 6
 The facts as to the Plan and the participation therein of appellants Wells and Albertsen were agreed upon as set forth in an extensive pretrial order.
 
 
 7
 Penney is a chain store operation. At the end of 1953 it had some 1634 stores located in all forty-eight states. Previous to the adoption of the Plan Penney had put into operation various stock participation plans, one of which was involved in the case of Hawke v. Commissioner of Internal Revenue, 9 Cir., 109 F.2d 946. Beginning in 1937 Penney made a study of various pension plans endeavoring to develop one suitable to Penney's needs. The Plan which we are called upon to consider herein was eventually adopted as of January 1, 1940. Pursuant thereto Penney sold 200,000 shares of its authorized unissued common stock to the designated trustee for the purpose of establishing a Trust Fund.[2] The Trustee borrowed the money for payment from the Continental Illinois National Bank & Trust Company of Chicago and paid Penney, pledging as security all stock and other assets of the Trustee except a sum not to exceed $150,000 which the Trustee retained for expenses.
 
 
 8
 The Plan provided that each participant[3] shall contribute annually to the Trust Fund one-third of his compensation[4] (later reduced to 20%).
 
 
 9
 Penney was required to contribute annually (a) an amount equal to 2% of the prior year's aggregate regular salary paid to all employees receiving compensation as defined in the Plan for all or any part of the respective years; (b) an amount equal to 6% of its consolidated net profits for the calendar year in excess of 15% of its common stock book value as of the beginning of such calendar year.
 
 
 10
 The Trust Fund also received all earnings, including dividends, on the Penney stock purchased by the Trustee, and after 1948 received rate credits from insurance companies.
 
 
 11
 Sixty years was fixed as the age of retirement. Between January 1, 1940 and January 1, 1945 retirement was optional at the discretion of the Board of Directors of Penney. Thereafter under an amendment to the Plan adopted in 1948 retirement became compulsory except in special cases the Board of Directors in its discretion might delay separation of any employee from the company's employment but such person must withdraw from participation in the Plan at the retirement age of sixty years. Effective January 1, 1945 optional retirement at age fifty-five was permitted in the discretion of the Board of Directors in exceptional circumstances. No participant had any right to continued employment by Penney but could be discharged by Penney without cause at any time prior to the time of acquiring retirement status. All participants so separating from the Plan before reaching retirement status were entitled to receive either in cash or in an annuity insurance contract an amount equal to the aggregate of his own contributions and in addition the other credits from the fund to which he was entitled under the Plan. In case of the death of any participant before reaching retirement status all monies due the deceased participant were payable to his proper beneficiary or legal representative. All participants upon reaching retirement status, in addition to cash or annuity covering contributions and credits from the fund, became entitled to receive shares of common stock of Penney computed according to a formula hereinafter discussed.
 
 
 12
 The foregoing is a brief outline of the background and principal features of the Plan so far as we are concerned with respect to the attack now being made upon it. As we proceed with the opinion further reference will be made to other pertinent facts as necessary.
 
 
 13
 The trial below having been by the district court without a jury findings of fact should not be set aside unless clearly erroneous. Fed.Rules Civ. Proc., rule 52(a), 28 U.S.C.A.; United States v. Foster, 9 Cir., 123 F.2d 32; Paramount Pest Control Service v. Brewer, 9 Cir., 177 F.2d 564; Puget Sound Pulp & Timber Co. v. O'Reilly, 9 Cir., 239 F.2d 607.
 
 
 14
 It is agreed that the Plan and trust agreement are to be construed in accordance with the laws of the state of New York. Appellants in this appeal are asking us to hold that the Plan so far as it pertains to the awarding of the capital stock sold to the Trustee by J. C. Penney Company to those reaching retirement status is a wagering contract or lottery or tontine contract, violative of the constitution, statutes, laws, or public policy of the state of New York. Our specific inquiry therefore is whether the highest court of New York would declare this Plan violative of the constitution, statutes, laws or public policy of the state of New York. We are not advised of any decision of the highest court of New York or any intermediate court of that state passing upon any plan by a private corporation for the retirement of its employees in any way comparable to the Plan herein. The excellent briefs of counsel for both sides show a great amount of research and many cases are discussed or cited, but they fail to disclose any case decided by the highest court in New York or of any intermediate court of that state which would appear to be controlling in passing upon the precise questions here involved. We are, therefore, called upon to determine, as best we may, what the courts in New York would hold if confronted with the controversy now presented to us. Hughes v. Mutual Life Ins. Co. of New York, 9 Cir., 180 F.2d 542; State of California, Dept. of Employment, etc. v. Fred S. Renauld & Co., 9 Cir., 179 F.2d 605; Compania Engraw Commercial E. Ind. v. Schenley Dist. Corp., 9 Cir., 181 F.2d 876.
 
 
 15
 In their Statement of Points filed pursuant to Rule 17(6) of the rules of this court, 28 U.S.C.A. appellants urged eight grounds for reversal.[5] In presenting their arguments they departed somewhat from the Statement of Points and argued the case under two main headings: (1) the provision of the Plan and trust agreement for the award of stock is illegal and void; and (2) the Trustee holds the shares of stock under a resulting trust for those whose contributions and earnings were used in their purchase.[6] We will consider first their contention that the provision of the Plan and trust agreement for the awarding of stock is illegal and void under New York constitution, statutes, laws and public policy. This contention includes, in substance, appellants' Points or Specifications of Error numbered 1, 2, 3, 6 and 7.
 
 
 16
 Appellants devote considerable of their argument under this contention to the proposition that "The stock scheme is a tontine contract involving wagers on the life of fellow participants in violation of New York law." They rely on Walker v. Walbridge, 151 Misc. 329, 271 N.Y.S. 473, which is a decision of an intermediate court in an action on a note given in connection with a life insurance contract involving "tontine" provisions; and on Colgrove v. Lowe, 343 Ill. 360, 175 N.E. 569, certiorari denied 284 U.S. 639, 52 S.Ct. 21, 76 L.Ed. 544; Knott v. State ex rel. Guaranty Income Life Ins. Co., 136 Fla. 184, 186 So. 176, 121 A.L.R. 715; Fuller v. Metropolitan Life Ins. Co., 70 Conn. 647, 41 A. 4; and United States Life Ins. Co. v. Spinks, 29 Ky.Law Rep. 960, 13 L.R.A.,N.S., 1053, rehearing denied 126 Ky. 405, 103 S.W. 335, appeal dismissed 209 U.S. 539, 28 S.Ct. 569, 52 L.Ed. 917. The last four of these cases directly involved insurance contracts containing some type of "tontine" provision.
 
 
 17
 The word "tontine" is defined in 1 Bouvier's Law Dict., Rawles Third Revision, page 1621:
 
 
 18
 "Tontine. A system of insurance which under various forms is based upon the idea of a loan or investment of property for the benefit of a number of persons, the income at first being divided among all and the shares of members who die passing not to their own legal representatives but to increase the interest of the surviving members, until, at last, after the number of members has gradually diminished by successive deaths, the last survivor takes the whole income, or, if such be the terms agreed upon, the whole principal. The system took its name from Lorenzo Tonti, an Italian of the seventeenth century, who first conceived the idea and put it in practice."
 
 
 19
 The word apparently is a word of art, and would seem to be properly used only in relation to insurance contracts.[7]
 
 
 20
 New York Law, 1906, c. 326 amended the insurance laws of New York so as to require annual apportionment of surplus, which had the effect of prohibiting the insertion of "tontine" provisions in life insurance policies written after the effective date of the act. Insurance Law, McKinney's Consol.Laws, c. 28, § 216. It would seem that it is primarily because of such law that insurance contracts containing "tontine" features are prohibited in New York. But such law and other insurance laws of the state of New York can have no proper application to the Plan herein unless it is found that it involves an insurance contract.[8] The necessity of qualifying the Plan under the insurance laws of New York was not urged below and the appellants do not now argue that such was necessary. Actually there is no contention that the Plan is a life insurance contract in any respect. Rather, it seems undisputed that it is a "profit-sharing retirement plan." Except for the fact that a participant upon ceasing to be a member of the Plan, either before or at the time of retirement, may receive the cash benefits to which he is entitled under the Plan through an annuity policy presumably purchased from a life insurance company, (and which portion of the Plan is something entirely separate and apart from the right of the participant who reaches retirement age to receive stock) the Plan has nothing whatever to do with life insurance as that term is commonly used and understood.
 
 
 21
 Thus appellants' argument, including the cases cited, concerning the alleged "tontine" character of the stock distribution under the Plan has no force except in so far as it may support their more general contention that the method of awarding the stock violates New York constitutional and statutory provisions against wagering contracts and lotteries. Under this broad contention we reach the principal feature of appellants' complaint. As a foundation to their argument they cite New York Constitution, Article I, Section 9, New York Penal Laws, McKinney's Consol.Laws, c. 40, Sections 991, 992, 1370, 1371 and 1386.[9] They also cite, among other cases, Irving v. Britton, 8 Misc. 201, 28 N.Y.S. 529; Carl Co. v. Lennon, 86 Misc. 255, 148 N.Y.S. 375; People v. Bloom, 222 App. Div. 451, 227 N.Y.S. 225, reversed on other grounds, 248 N.Y. 582, 162 N.E. 533.
 
 
 22
 The Irving case involved pool selling and bookmaking on a horse race. Carl Co. involved a scheme where small banks were sold for twenty-five cents each and the name of a purchaser was selected or drawn each day and such purchaser became entitled to one dollar's worth of goods. Bloom involved a similar trade stimulant by a jewelry store.
 
 
 23
 We find these decisions inapposite. Likewise, Fitzsimmons v. United States, 9 Cir., 156 F. 477, 13 L.R.A.,N.S., 1095, cited by appellants, wherein this court held that the scheme of the Commercial Credit Company in selling its certificates constituted a lottery under the postal laws. We are unable to see the similarity between the bank scheme involved in Carl Co. or the purchase of jewelry in People v. Bloom on the one hand and a retirement plan such as we have before us. There is a fundamental and material difference in the aims, purposes and detail of the operation of the plans involved in the cited cases and of those involved in the Penney profit-sharing retirement plan.
 
 
 24
 Throughout the decisions striking down the various transactions found to be lotteries or wagering contracts we find the court referring to "schemes" or "devices", the effect of which, if permitted, would induce or lure the public to participate. While we do not here attempt to determine precisely what restrictions must be imposed upon the participation of persons in a transaction to exclude it from the provision of anti-gambling laws, it is clear from the record in this case that the provisions of the stock distribution aspect of the Plan are such as to discourage the probabilities of the stock being distributed to or acquired by the public. Certainly the "lure" to the public so often condemned by the courts in outlawing wagering contracts is not present here.
 
 
 25
 In Irving v. Britton, 8 Misc. 201, 28 N.Y.S. 529, 530, cited by both appellants and appellees, it is said:
 
 
 26
 "From all the cases these are collected as the constituent elements of a lottery, namely: First, an expedient held out to the public; which, secondly, for a pecuniary consideration, offers the possibility and promise of a gain, not the product of the outlay, but contingent merely upon a designated chance event. As the name imports, the lot or chance is the essential property of the unlawful enterprise, and the allurement to the public the incident that aggravates its mischievous quality."
 
 
 27
 In People v. Hines, 284 N.Y. 93, 29 N.E.2d 483, 487, the court defined a lottery as "a scheme for the distribution of property in which a valuable consideration is paid on chance alone, with no admixture of skill."
 
 
 28
 In People ex rel. Ellison v. Lavin, 179 N.Y. 164, 71 N.E. 753, 755, 66 L.R.A. 601, the court stated:
 
 
 29
 "The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game?"
 
 
 30
 In People v. Gillson, 109 N.Y. 389, 17 N.E. 343, 347, the court in holding a New York statute prohibiting the giving away of premiums with sales of goods to be unconstitutional said:
 
 
 31
 "The learned counsel for the people claims that the act is a valid exercise of the police power, in furtherance of the policy of the state to prohibit the setting up of lotteries and the sale of lottery tickets. * * * So in regard to lotteries in general. A wide-spread custom of indulging in the purchase of tickets leads, among the poorer classes certainly, and also among others, to habits of recklessness, waste, and idleness. It cultivates a gambling spirit, and tends to a hatred of honest labor, and to a desire to obtain riches or money without the necessary expenditure of industrious energy."
 
 
 32
 In People v. Mail and Express Co., Sp. Sess., 1919, 179 N.Y.S. 640, 644, which was affirmed without opinion in 192 App.Div. 903, 182 N.Y.S. 943 and 231 N.Y. 586, 132 N.E. 898, the defendants were charged with violations of Penal Law, section 1370 in that they had put into effect a scheme to distribute cards bearing serial and individual designations and had announced that they would distribute among the holders of such cards certain sums of money. The court discusses the nature of lotteries in general and held that the evil to which the lottery law was directed was "essentially selling to many for a little paid by each the chance to win much," and held:
 
 
 33
 "First. The acts of the defendants are without the definition expressly set out in the law, and the court in its proper province cannot put them within it.
 
 
 34
 "Second. That the acts here complained of have the same moral quality as those literally described in the law is matter of opinion, and the judicial branch of the government may not lawfully attribute to the legislative branch an opinion which the latter has not expressed."
 
 
 35
 In People ex rel. Blumke v. Foster, 300 N.Y. 431, 91 N.E.2d 875, 876, it is said:
 
 
 36
 "In this State, no act or omission is a crime unless some statute of the State makes it so. Penal Law, § 22."
 
 
 37
 In Metropolitan Life Ins. Co. v. Durkin, 301 N.Y. 376, 93 N.E.2d 897, 899, the court said:
 
 
 38
 "Such statutes directed against known and stated evils, are not to be stretched to cover situations having no real or reasonable relation to those evils."
 
 
 39
 In the Durkin case such principle was applied to a statute prohibiting bonuses to insurance solicitors. In H. Kauffman & Sons Saddlery Co., Inc. v. Miller, 298 N.Y. 38, 80 N.E.2d 322 the same principle was applied in a commercial rent law case. In Breen v. Board of Trustees of New York Fire Dept. P. F., 299 N.Y. 8, 85 N.E.2d 161, the same principle was applied in a fire department pension case.
 
 
 40
 In F. C. C. v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 600, 98 L.Ed. 699, it was held that "giveaway" programs did not violate section 1304 of the United States criminal code, 18 U.S.C.A. § 1304, prohibiting the broadcasting of "any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance," the court stating, in part:
 
 
 41
 "We believe that it would be stretching the statute to the breaking point to give it an interpretation that would make such programs a crime. * * *
 
 
 42
 "It is true, as contended by the Commission, that these are not criminal cases, but it is a criminal statute that we must interpret. There cannot be one construction for the Federal Communications Commission and another for the Department of Justice. If we should give § 1304 the broad construction urged by the Commission, the same construction would likewise apply in criminal cases. We do not believe this construction can be sustained. Not only does it lack support in the decided cases, judicial and administrative, but also it would do violence to the well-established principle that penal statutes are to be construed strictly."
 
 
 43
 Applying the rationale as expressed in the foregoing cases all of which with the exception of two are from the courts of New York, there would seem to be no "lot" or "chance" involved in the Plan in the sense that such elements contaminate a contract. The contributions of the various participants are fixed not in dollars and cents but by a formula easy of computation. Likewise, the formula for Penney's contributions is definitely fixed; also definite allocation of all earnings of the trust is provided. If a participant leaves the Plan or is discharged before reaching retirement age the monies (or annuity) he will receive is definitely provided.[10] If a participant dies while still in the Plan the amounts otherwise payable to him are paid to his heirs or estate. If a participant continues in the Plan until reaching retirement age then in addition he will receive shares of stock according to a fixed formula.
 
 
 44
 Thus the awarding of stock of which appellants complain permits of two possible situations which are not fixed with certainty in the Plan — one is the death of the participant before reaching retirement age and the other is the discharge or withdrawal of a participant before reaching such age.
 
 
 45
 To quote an apt judicial statement cited in appellees' brief, "The life of a man is determined by the laws of nature, and not by the chances of lot."[11] Conceding that participants have no insurable interest in the life of other participant members so as to entitle any of them to take out a life insurance policy on the life of any of such other participants, such lack of insurable interest does not make the possible death of any other participant before reaching full retirement age a "lot" or "chance" within the meaning of the lottery or gambling laws. Death is something which all living persons must eventually face. It is a certainty. Whether a participant lives to retirement age may be termed a "chance" it is true, but it is an unavoidable "chance" and one which everyone, whether participant in the Plan or not, must face and weigh in connection with any undertaking.
 
 
 46
 With respect to the element of chance involved in the possible discharge or withdrawal of a participant by Penney before such participant reaches retirement age, can we find that this is such "lot" or "chance" as is contemplated in the anti-gambling laws or under the constitution of the state of New York? Loss of employment, with or without fault on his part, is one of the usual and ordinary risks which every employee assumes when he enters employment. Penney reserved the right to discharge any participant at any time prior to his acquiring retirement status. No participant prior to or following his participation had any right to continued employment by Penney under the evidence in the case. Penney's right to discharge any participant was known or should have been known to such participant at the time he became a member of the Plan.
 
 
 47
 While appellants do not contend that a participant as such had a right to continued employment they do argue that the remaining participants nevertheless benefit by the predecease, discharge or withdrawal of others because of the increasing percentage of stock which they contend such remaining participants will be entitled to receive on their retirement. Related to this argument is the additional one that the Plan is unfair, discriminatory and illegal because older employees, among them some members of the Company's Board of Directors, who were among the first to qualify for retirement with stock, received a greater number of shares than younger and future employees will receive when they retire.
 
 
 48
 With respect to the first of these assertions it might be tenable if the number of original participants had been frozen at a fixed number. However, the number of participants were not so frozen or fixed. The Plan is a continuing one as it must necessarily be to accomplish its purposes. As one store manager retires, dies, resigns or is discharged he is immediately replaced by another who must belong to the Plan so that the total number of participants in that class remains the same, except as they may be increased by additional stores. The same is true as to other classes of participants, with possibly minor exceptions too few to be material. In 1940 when the Plan was established there were 1716 participants; at the end of the year 1953 there were 1955 participants. The number of participants entering the Plan from 1940 to 1953 was 1454 as against 1215 leaving the Plan either on retirement or earlier separation, including death.
 
 
 49
 The Plan provides for dividing the 200,000 shares of stock[12] into two blocks: a 50,000 (150,000) share block and a 150,000 (450,000) share block. The formula for distribution of the stock to retiring participants[13] works out substantially as follows for all participants retiring before exhaustion of the smaller share block. The number of shares of stock to be received by each retiring participant is determined by the percentage which his individual contributions bear to the total contributions of all participants, which percentage is then applied to the larger or 150,000 (450,000) share block, and then the resulting number of shares so determined is distributed to such retiring participant from the smaller or 50,000 (150,000) share block until such smaller block is exhausted. In determining the number of shares to be distributed to retiring participants after exhaustion of the smaller block the method of computing the percentage remains the same but such percentage is applied not to the whole 150,000 (450,000) share block but to the number of shares then remaining in such block, and such retiring participant then receives such resulting number of shares from the number then remaining in the larger block.
 
 
 50
 When the Plan began actual operation on August 1, 1940 the Trustee had received contributions from participants of $1,575,000 and from Penney 200,000 shares of stock[14] but owed the Chicago bank $5,700,000. By the end of 1953 the Chicago bank had been paid, all expenses met, all participants separating from the Plan either on retirement or otherwise had been paid in full, either in cash or annuities, and those reaching retirement age had received their proper number of shares of stock computed according to the formula. In the course of this operation there had been paid to participants the sum of $24,151,213.32, and the Trustee at the end of December, 1953 held some $67,786,594.59 for future distribution, together with 483,754 shares of stock (taking into account the three-for-one split), which on that date were worth slightly less than $36,000,000 according to the New York Stock Exchange listings.
 
 
 51
 In analyzing the sources of income of the fund as of December 31, 1953 it appears that as between contributions received from employees and those received from Penney,[15] excluding dividends on stock, approximately 62½% was received from employees and 37½% from Penney.
 
 
 52
 A more detailed examination of the fund, its sources and growth, a full statement of which would unduly extend this opinion, establishes clearly that younger and future employees will benefit from substantial accumulations not available to the older employees no longer participating, whether retired or otherwise separated.
 
 
 53
 The evident intent of the Plan was that older employees, who because of age would be required to retire early in the Plan, would receive a greater number of shares on such retirement than would the younger employees then in the Plan or future employees. On the other hand younger employees and future employees upon retirement would receive larger credits as the result of accumulating payments into the fund by Penney which would offset any possible advantage because of the greater number of shares of stock received by those who retired earlier. The effect of such formula of distribution would seem to provide a method of equalizing total benefits for all retiring participants.
 
 
 54
 We can find no evidence in the record, apart from the mere assertion of appellants, that the formula of distribution was unfair, discriminatory or illegal because older employees received a greater number of shares than younger and future employees will receive when they retire. The personal contribution of each participant was fixed at a uniform percentage of his profit-sharing compensation. Such compensation is determined by agreement between Penney and the various participants or employees and is something entirely apart from the Plan. Benefits receivable by participants under the Plan, whether in cash, annuity or stock, would seem to be directly related to the compensation received by each participant.
 
 
 55
 Appellants urge various illustrative examples endeavoring to show that the death, discharge or voluntary withdrawal of a participant benefits the remaining participants. Appellees challenge such conclusion and give countering illustrations, showing that the number of shares which a retiring participant would be entitled to receive upon retirement is not materially affected by the number of previous withdrawals from the Plan. The exact amount which any participant would contribute in any year necessarily depends upon a number of factors. Among such factors are the location of individual stores and the general economic conditions in the community. Changes in store locations will have an effect. The general economic conditions of the entire country might result in fluctuations from year to year in the net profit of any company of the size of the Penney Company.
 
 
 56
 It would seem that the cited instances given by both appellants and appellees do nothing more than show the elasticity and adaptability as well as the practicability of the Plan rather than to demonstrate any preconceived scheme to benefit any particular class of participants or to show that the operation of the Plan accomplished any intentional or accidental benefit to any particular class of participants.
 
 
 57
 With respect to the issues we have outlined and considered above the trial court made the following pertinent findings of fact:
 
 
 58
 "42.
 
 
 59
 "The purposes of the Plan were:
 
 
 60
 "(a) to inaugurate a compulsory retirement policy,
 
 
 61
 "(b) to help provide security for the future,
 
 
 62
 "(c) to provide liberal benefits on retirement and earlier separation,
 
 
 63
 "(d) to constitute an improvement over the former outright sales of Penney Company stock from time to time to associates, and
 
 
 64
 "(e) to act as a further incentive to those who were serving and preparing to serve
 
 
 65
 "(i) by providing for credits to accounts from Company contributions measured by profits and from dividends on the Penney Company stock held in the Trust, and
 
 
 66
 "(ii) from the potential ownership of Penney Company stock to be received upon reaching retirement status.
 
 
 67
 * * * * * *
 
 
 68
 "45.
 
 
 69
 "The Plan is liberal in that, although only participants reaching retirement status receive shares of stock in addition to their other credits, a participant leaving the employment of the Company at any time before reaching retirement status, regardless of his length of service or years of participation or the reason for his separation, not only receives back all of his own contributions to the Plan but also receives all other credits to his account, computed in the same manner as though he had reached retirement status.
 
 
 70
 "46.
 
 
 71
 "The fact that older employees, among them some members of the Company's Board of Directors, who were among the first to qualify for retirement with stock, received a slightly greater number of shares than younger and future employees will receive when they retire, does not render the Plan unfair or discriminatory. There is a sound and rational basis for permitting employees who have not built up large credits for themselves under other provisions of the Plan to receive an advantage in connection with the distribution of stock under the formula set forth in Finding of Fact 31, subparagraph C.
 
 
 72
 "47.
 
 
 73
 "The Plan is generous and sound.
 
 
 74
 "48.
 
 
 75
 "The Plan does not:
 
 
 76
 "(a) encourage any passion for gambling,
 
 
 77
 "(b) take money from people who can ill afford to lose it,
 
 
 78
 "(c) encourage hope of gain without service or effort,
 
 
 79
 "(d) induce habits of waste, idleness or hatred of honest labor,
 
 
 80
 "(e) promote deterioration of moral qualities, or
 
 
 81
 "(f) discourage useful business and industry.
 
 
 82
 "The plan is not a lottery or a wagering contract; neither is it a Tontine contract."
 
 
 83
 The issues we have considered and the findings set forth involve mixed questions of law and fact. So far as the factual issues are concerned the record provides ample evidence to support the trial court's findings as we have attempted to show.
 
 
 84
 With respect to the law one predominant feature in all of the New York decisions relating to lotteries or wagering contracts, some of which we noted, is that they deal with some method or form of lottery or wagering as those terms are commonly understood. Counsel have cited no New York cases nor has our research revealed any which deal with a transaction remotely resembling the Plan herein from the standpoint of lottery or wagering. While they are entitled to credit for their ingenuity it is only by the interweaving of theories and the most circuitous reasoning that appellants have been able to make a showing that the Plan could be violative of the New York constitution, laws, statutes or public policy relating to lotteries or gambling.
 
 
 85
 It is our opinion, therefore, that if the matter ever comes before the courts of the state of New York it will be held that the Plan is not violative of the constitution, laws, statutes or public policy of the state of New York, and we so hold.
 
 
 86
 In reaching this conclusion we have not made reference to appellants' assignments of error numbered 6 and 7. We do not because we believe the issues presented to be irrelevant and purely academic unless we are to find the Plan in some respect illegal as contended under the first three assignments of error, which we do not.
 
 
 87
 Assignments of error numbered 5 and 8 require no discussion as they relate to relief that might be granted appellants only in the event the Plan is found to be illegal.
 
 
 88
 There remains for consideration appellants' specification of error numbered 4, which is that the trial court erred in admitting in evidence, over the objection of appellants, the testimony of A. W. Hughes, consisting of extrinsic evidence concerning the meaning of the Plan. On direct examination counsel for appellees asked Mr. Hughes, President of Penney, "the reason why there was included in the profit-sharing retirement plan the provisions for stock being issued to participants who left on the retirement age." Opposing counsel objected to the question on the ground that it was an attempt to vary the written Plan as adopted and was immaterial to any issue raised. Later, after a lengthy response to the question, all of which was subject to appellants' objection, counsel for appellants interrupted, stating:
 
 
 89
 "If your Honor please, the question asked of the witness is why they put stock in the plan. We are now getting a lecture on the whole subject. I object to it as immaterial, but if your Honor wants to hear it, it is all right with me."
 
 
 90
 Appellees contend that appellants withdrew their objection because of the italicized language quoted above. Appellants apparently concede the validity of the contention as no argument to the contrary appears in their brief. Furthermore waiver of the objection by appellants is indicated by their reliance on Hughes' testimony in their brief.[16]
 
 
 91
 However, assuming the objection was not withdrawn or waived, in an action such as this tried to the court without a jury, it will be presumed on appeal that the trial court considered only competent evidence, if the record shows such evidence. United States v. National Bank of Commerce of Seattle, 9 Cir., 73 F.2d 721. Here if the evidence objected to be disregarded there is still ample evidence to support the findings made by the lower court.
 
 
 92
 Judgment affirmed.
 
 
 
 Notes:
 
 
 [1]
 This action was brought by appellants on behalf of themselves and all former participants and former beneficiaries of the trust who did not attain retirement status thereunder and the heirs and legal representatives of former participants and former beneficiaries of the trust who died prior to attaining retirement status, whose contributions and earnings were used in the acquisition of the J. C. Penney Company stock purported to be held in trust by the Trustee
 
 
 [2]
 The Chase National Bank of the City of New York — name later changed to Chase Manhattan Bank
 
 
 [3]
 Provision 3 of the Plan reads: "The following classes of employees of the company and of any wholly owned subsidiary shall be eligible to participate in the Plan: store managers and central and branch office employees who have a contract entitling them to receive compensation as hereinbefore defined, which includes store managers, buyers, employees holding positions of responsibility in the central and branch offices of the company, and executives, including those who are directors, but excluding those who serve as directors only. It shall also include employees holding positions of responsibility in any wholly owned subsidiary determined by the Administrative Committee to be eligible. It shall also include any other classes of employees entitled to receive compensation who may be determined by the Administrative Committee at any time to be eligible. Participation by all eligible employees shall be required, except that participation by an otherwise eligible employee whose compensation does not cover a full calendar year shall not be permitted for such year, except in any case where a leave of absence covering that portion of any year for which compensation is not paid is approved by the Administrative Committee as not requiring withdrawal. In any case, however, where a separate manager contract or contracts and/or rights to share in the General Office Compensation Fund each cover only a portion of a year but combined cover a full calendar year, participation for such year shall be permitted on the basis of total compensation received. In any case or cases where, because of special circumstances, it is recommended that more than one employee of a store shall be considered as an eligible manager, the Administrative Committee shall have sole power to decide as to eligibility."
 
 
 [4]
 "Compensation" is defined in the Plan as follows: "The term `compensation' as used herein means the amount received by an employee of J. C. Penney Company under contract as a portion of the profits of the store managed by him, or the amount received by a central or branch office employee as his or her share of the General Office Compensation fund, as the case may be, and excludes regular salary. If so determined by the Administrative Committee, it may also include other compensation than that specified above, apart from regular salary, based on profits received by employees of J. C. Penney Company."
 
 
 [5]
 "1. The district court erred in failing to find that the J. C. Penney Company profit-sharing retirement plan (for J. C. Penney Company management staff) and the agreement of trust provide benefits contingent on the lives of participants contrary to New York law
 "2. The district court erred in finding that the retirement plan was not unfair, discriminatory or illegal because older employees, among them some members of the company's board of directors, who were among the first to qualify for retirement with stock, received a greater number of shares than younger and future employees will receive when they retire. This error is contained in the district court's finding of fact No. 46 and conclusion of law No. 13.
 "3. The district court erred in finding that the retirement plan, so far as it pertains to the shares of capital stock of J. C. Penney Company, is not a wagering contract, lottery or tontine contract and does not violate the New York Constitution, statutes, laws and public policy prohibiting such contracts and schemes. This error is contained in the district court's findings of fact No. 47 and 48 and conclusions of law No. 5, 6, 7, 8 and 10.
 "4. The district court erred in admitting in evidence, over the objections of appellants, the testimony of Albert W. Hughes consisting of extrinsic evidence concerning the meaning of the retirement plan and trust.
 "5. The district court erred in failing to find that the trust purported to be established under the retirement plan, so far as it pertains to the shares of capital stock of J. C. Penney Company, was and is illegal and void and of no effect and in failing to adjudge and decree that the Trustee holds the shares of stock of J. C. Penney Company under a resulting trust in favor of appellants and those for whom appellants prosecute this action. This error is contained in the district court's conclusions of law No. 17, 18, 20 and 21.
 "6. The district court erred in finding that the stock portion of the retirement plan is unseverable from the remaining portions of the plan. This error is contained in the district court's findings of fact No. 43 and 44 and conclusion of law No. 9.
 "7. The district court erred in finding that it would be highly inequitable to permit appellants to recover in this proceeding on their own behalf and on behalf of the class for which they are suing. This error is contained in the district court's finding of fact No. 58 and conclusion of law No. 19.
 "8. The district court erred in failing to award appellants compensation for the reasonable value of the services of their attorneys in the prosecution of this action and for their costs and disbursements incurred herein, and in failing to decree that the sum so awarded should constitute a lien upon the shares of stock found by the court to have been acquired by the contributions and earnings of appellants and those for whom they prosecuted this action."
 
 
 [6]
 
 "Summary of Argument
 "I. The Provision of the Plan and Trust Agreement for the Award of Stock Is Illegal and Void.
 "A. The Award of Stock is Contingent on the Lives and Continued Employment of Participants Contrary to New York law and Public Policy.
 "1. The stock scheme is a tontine contract involving wagers on the lives of fellow participants in violation of New York law.
 "2. The method for awarding the stock purchased with the contributions and earnings of participants violates New York constitutional and statutory prohibitions against wagering contracts and lotteries.
 "B. The Nature of the Scheme for Awarding Stock, not the Alleged Good Intentions of the Sponsors, Determines Whether or not it Constitutes a Tontine Contract, Wagering Contract or Lottery.
 "II. The Trustee Holds the Shares of Stock under a Resulting Trust for Those Whose Contributions and Earnings Were Used in Their Purchase.
 "A. The Assets of a Trust, or any Part Thereof, Which is Illegal and Void, are Held in a Resulting Trust for Those who Contributed to the Trust.
 "B. The Stock was Purchased With the Contributions and Earnings of Those Persons who were Participants in the Plan During 1940 and 1941."
 
 
 [7]
 Many insurance policies containing "tontine" features were enforced by the courts of New York prior to 1906. Bogardus v. New York Life Ins. Co., 1886, 101 N.Y. 328, 4 N.E. 522; Uhlman v. New York Life Ins. Co., 1888, 109 N.Y. 421, 17 N.E. 363; Columbia Bank v. Equitable Life Assur. Soc., 1st Dept. 1903, 79 App.Div. 601, 80 N.Y.S. 428; Langdon v. Northwestern Mut. Life Ins. Co., 1910, 199 N.Y. 188, 92 N.E. 440; Danner v. Equitable Life Assurance Society of the United States, 1st Dept. 1913, 156 App.Div. 562, 141 N.Y.S. 442
 
 
 [8]
 In Colaizzi v. Pennsylvania R. Co., 208 N.Y. 275, 101 N.E. 859, it was held that the participation of a railroad did not bring an operation within the language of Section 201 of the Insurance law (Consol.Laws 1909, c. 28) where the railroad maintained a contributory relief fund for its employees under which benefits were payable upon disability or death
 
 
 [9]
 New York Constitution, Article (I), Section 9: "* * * no lottery * * * or any other kind of gambling, * * * shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section." New York Penal Law, Section 991: "All * * * stakes, made to depend * * * upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."
 New York Penal Law, Section 992: "All contracts for or on account of any money or property, or thing in action * * * staked, as provided in the preceding section, shall be void."
 New York Penal Law, Section 1370: "A `lottery' is a scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise or by some other name."
 New York Penal Law, Section 1371: "A lottery is unlawful and a public nuisance."
 New York Penal Law, Section 1386: "All contracts, agreements and securities given, made or executed, for or on account of any raffle, or distribution of * * * any money, goods or things in action, so raffled for, or agreed to be distributed as aforesaid, shall be utterly void."
 
 
 [10]
 Without exception every participant or his heir or representative receives back all he has contributed, and save for the very few who left the company within a year after the plan began operation and before earnings accrued all participants have or will receive substantially more than their contributions
 
 
 [11]
 From instructions to the jury by Gross-cup, District Judge, in United States v. McDonald, D.C., 59 F. 563 affirmed 7 Cir., 63 F. 426
 
 
 [12]
 On January 16, 1946 Penney stock was split three for one
 
 
 [13]
 Provision 10A(b) provides:
 "1. In addition, the retiring participant will receive without cost, from the 50,000 share block of J. C. Penney Company common stock, that number of shares (but never in excess of 1,000 shares) represented by the proportion of 150,000 shares that the participant's total contributions at the time of his or her retirement bear to the aggregate of such contributions of all participants in the Fund at such time — except that at any time that any cost determined as applying to the 50,000 share block is not covered by credits, the participant, in order to receive any shares, must pay the Trustee or have deducted from the amount available for the purchase of his annuity, the net debit cost at the time of retirement of the shares to which he or she is entitled.
 "2. When the 50,000 share block of stock is exhausted, distribution on retirement shall be from the 150,000 share block, based on the proportion of the remaining shares that the retiring participant's total contributions at the time of his or her retirement bear to the aggregate contributions of all participants at such time. In such event, the stock shall be delivered to the retiring participant without charge and there shall be charged against the Reserve for Retirement account the uncovered cost of the stock delivered to any retiring participant as represented by the stock account of the Fund. The number of shares to be distributed to any participant shall be limited to 1,000."
 
 
 [14]
 The Plan provided that Penney upon adoption of the Plan would sell to the Trustee for cash stock at book value of $30 whereas the stock was quoted on the New York Stock Exchange on January 2, 1940 at $94.50 and on August 1, 1940 at $80
 
 
 [15]
 Included in the contribution credited to Penney is the sum of $10,000,000 being the difference between the book value and market value of the stock conveyed to the Trustee as of August 1, 1940
 
 
 [16]
 See appellants' brief p. 74